DeCOTEAU, NATURAL MOTHER AND NEXT FRIEND OF FEATHER ET AL. *v.* DISTRICT COUNTY COURT FOR THE TENTH JUDICIAL DISTRICT

No. 73–1148.   Argued December 16, 1974— Decided March 3, 1975*

*Bertram E. Hirsch* argued the cause for petitioner in No. 73–1148.   With him on the briefs was *Arthur Lazarus, Jr.   William F. Day, Jr.,* Special Assistant Attorney

*Together with No. 73–1500, *Erickson, Warden* v. *United States ex rel. Feather et al.,* on certiorari to the United States Court of Appeals for the Eighth Circuit.

General of South Dakota, argued the cause for petitioner in No. 73–1500 and respondent in No. 73–1148. On the briefs were *Kermit A. Sande,* Attorney General, *Walter W. Andre,* Assistant Attorney General, and *Tom D. Tobin,* Special Assistant Attorney General. *Larry R. Gustafson* argued the cause and filed a brief for respondents in No. 73–1500.

*Harry R. Sachse* argued the cause for the United States as *amicus curiae* urging affirmance in No. 73–1500. With him on the brief were *Solicitor General Bork, Assistant Attorney General Johnson, Louis F. Claiborne,* and *Edmund B. Clark.*†

MR. JUSTICE STEWART delivered the opinion of the Court.

These two cases, consolidated for decision, raise the single question whether the Lake Traverse Indian Reservation in South Dakota, created by an 1867 treaty between the United States and the Sisseton and Wahpeton bands of Sioux Indians, was terminated and returned to

---

†*Solicitor General Bork, Assistant Attorney General Johnson, Louis F. Claiborne, Harry R. Sachse,* and *Edmund B. Clark* filed a brief for the United States as *amicus curiae* urging reversal in No. 73–1148.

*Allen I. Olson,* Attorney General, and *Paul M. Sand,* First Assistant Attorney General, filed a brief for the State of North Dakota as *amicus curiae* urging affirmance in No. 73–1148, joined by the Attorneys General for their respective States as follows: *Evelle J. Younger* of California, *W. Anthony Park* of Idaho, *Richard C. Turner* of Iowa, *Robert L. Woodahl* of Montana, *Clarence A. H. Meyer* of Nebraska, *Robert List* of Nevada, *David L. Norvell* of New Mexico, *Larry D. Derryberry* of Oklahoma, *Slade Gorton* of Washington, and *Robert W. Warren* of Wisconsin.

Briefs of *amici curiae* urging affirmance in No. 73–1500 were filed by *Glen A. Wilkinson, Jerry C. Straus,* and *Richard A. Baenen* for the Arapahoe Tribe of Wind River Reservation et al., and by the Sisseton-Wahpeton Sioux Tribe.

the public domain, by the Act of March 3, 1891, c. 543, 26 Stat. 1035. In each of the two cases, the South Dakota courts asserted jurisdiction over members of the Sisseton-Wahpeton Tribe for acts done on lands which, though within the 1867 reservation borders, have been owned and settled by non-Indians since the 1891 Act. The parties agree that the state courts did not have jurisdiction if these lands are "Indian country," as defined in 18 U. S. C. § 1151,[1] and that this question depends upon whether the lands retained reservation status after 1891.[2] We hold, for the reasons that follow, that the

---

[1] "Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country,' as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

[2] If the lands in question are within a continuing "reservation," jurisdiction is in the tribe and the Federal Government "notwithstanding the issuance of any patent, [such jurisdiction] including rights-of-way running through the reservation." 18 U. S. C. § 1151 (a). On the other hand, if the lands are not within a continuing reservation, jurisdiction is in the State, except for those land parcels which are "Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." 18 U. S. C. § 1151 (c). Even within "Indian country," a State may have jurisdiction over some persons or types of conduct, but this jurisdiction is quite limited. See, e. g., McClanahan v. Arizona State Tax Comm'n, 411 U. S. 164; Williams v. Lee, 358 U. S. 217; Worcester v. Georgia, 6 Pet. 515. While § 1151 is concerned, on its face, only with criminal jurisdiction, the Court has recognized that it generally applies as well to questions of civil jurisdiction. McClanahan v. Arizona State Tax Comm'n, supra, at 177–178, n. 17; Kennerly v. District Court of Montana, 400 U. S. 423, 424 n. 1; Williams v. Lee, supra, at 220–222, nn. 5, 6, and 10.

1891 Act terminated the Lake Traverse Reservation, and that consequently the state courts have jurisdiction over conduct on non-Indian lands within the 1867 reservation borders.

## I

The 1867 boundaries of the Lake Traverse Reservation enclose approximately 918,000 acres of land. Within the 1867 boundaries, there reside about 3,000 tribal members and 30,000 non-Indians. About 15% of the land is in the form of "Indian trust allotments"; these are individual land tracts retained by members of the Sisseton-Wahpeton Tribe when the rest of the reservation lands were sold to the United States in 1891. The trust allotments are scattered in a random pattern throughout the 1867 reservation area. The remainder of the reservation land was purchased from the United States by non-Indian settlers after 1891, and is presently inhabited by non-Indians.

It is common ground here that Indian conduct occurring on the trust allotments is beyond the State's jurisdiction, being instead the proper concern of tribal or federal authorities. In the two cases before us, however, the State asserted jurisdiction over Indians based on conduct occurring on non-Indian, unallotted land within the 1867 reservation borders.

The petitioner in No. 73-1148, Cheryl Spider DeCoteau, is the natural mother of Herbert John Spider and Robert Lee Feather; all are enrolled members of the Sisseton-Wahpeton Tribe. Both children have been assigned to foster homes by order of the respondent District County Court for the Tenth Judicial District of South Dakota. The petitioner gave Robert up for adoption in March of 1971, and Herbert was later separated from her through neglect and dependency proceedings in the respondent court, initiated by the State Welfare Depart-

ment. On August 31, 1972, the petitioner commenced a habeas corpus action in a State Circuit Court alleging that the respondent had lacked jurisdiction to order her children separated from her and asking that they be released from the custodial process of the respondent. After a hearing, the state court denied the writ, finding that the respondent had possessed jurisdiction because "the non-Indian patented land, upon which a portion of the acts or omissions giving rise to the Order of the District County Court occurred, is not within Indian Country." [3] While acknowledging that this non-Indian patented land is within the 1867 boundaries of the Lake Traverse Reservation, the court noted that the tribe "had sold or relinquished [the non-Indian land in question] to the United States under the terms of the agreement which was ratified by acts of Congress, March 3, 1891." The South Dakota Supreme Court affirmed,[4] upon the ground that the 1891 Act ratified an 1889 Agreement by which

"the Sisseton and Wahpeton Bands of Indians sold their unallotted lands, and the United States Government paid a sum certain for each and every acre

[3] The Circuit Court's opinion of September 26, 1972, is unpublished. It was stipulated that some 50% of the mother's allegedly wrongful acts and omissions occurred on non-Indian patented land, the remainder occurring on Indian allotments over which the State does not have jurisdiction. The parties here have assumed that the State had jurisdiction to exercise custody over the petitioner's children if the non-Indian, patented lands were not "Indian country" under 18 U. S. C. § 1151 (a). We have made the same assumption. We note, however, that § 1151 (c) contemplates that isolated tracts of "Indian country" may be scattered checkerboard fashion over a territory otherwise under state jurisdiction. In such a situation, there will obviously arise many practical and legal conflicts between state and federal jurisdiction with regard to conduct and parties having mobility over the checkerboard territory. How these conflicts should be resolved is not before us.

[4] 87 S. D. 255, 211 N. W. 2d 843.

purchased. . . . This, then, was an outright cession and sale of lands by the Indians to the United States. The land sold was separated from the reservation by Congress and became part of the public domain." [5]

The relators in No. 73–1500 are enrolled members of the tribe who were convicted in South Dakota courts of various violations of the State's penal laws committed on non-Indian lands within the 1867 reservation boundaries. The relators, in the custody of a state penitentiary, separately petitioned for writs of habeas corpus in the United States District Court for the District of South Dakota, alleging that the state courts had lacked criminal jurisdiction over their conduct within the 1867 reservation boundaries. The District Court summarily denied the petitions, but the Court of Appeals for the Eighth Circuit reversed.[6] In *DeMarrias v. South Dakota,* 319 F. 2d 845, that court had previously held that the 1891 Act had terminated the Lake Traverse Reservation, leaving only allotted Indian lands within tribal or federal jurisdiction. But in the present case the Court of Appeals overruled its *DeMarrias* decision, finding it inconsistent with the principles of statutory construction established by this Court in *Mattz v. Arnett,* 412 U. S. 481, and *Seymour v. Superintendent,* 368 U. S. 351. The Court of Appeals accordingly held that "[t]he boundaries of the Lake Traverse Indian reservation remain as they were established in 1867. The scene of the alleged crimes is, therefore, within Indian country. South Dakota had no jurisdiction to try appellants." 489 F. 2d 99, 103.

We granted certiorari in the two cases, 417 U. S. 929, to resolve the conflict between the Supreme Court of South Dakota and the Court of Appeals for the Eighth Circuit

---

[5] *Id.,* at 559, 211 N. W. 2d, at 845.

[6] 489 F. 2d 99.

as to the effect of the 1891 Act on South Dakota's civil and criminal jurisdiction over unallotted lands within the 1867 reservation boundaries.

## II

When the Sioux Nation rebelled against the United States in 1862, the Sisseton and Wahpeton bands of the Nation remained loyal to the Federal Government, many members serving as "scouts" for federal troops. This loyalty went unrecognized, however, when the Government confiscated the Sioux lands after the rebellion. In a belated act of gratitude, the United States entered into a treaty with the Sisseton-Wahpeton Tribe in 1867. The treaty granted the tribe a permanent reservation in the Lake Traverse area, and provided for tribal self-government under the supervision of federal agents.[7]

But familiar forces soon began to work upon the Lake Traverse Reservation. A nearby and growing population of white farmers, merchants, and railroad men began urging authorities in Washington to open the reservation to general settlement. The Indians, suffering from disease and bad harvests, developed an increasing need for cash and direct assistance.[8] Meanwhile, the Govern-

---

[7] Treaty of Feb. 19, 1867, 15 Stat. 505. The treaty is reprinted as Appendix A to this opinion.

[8] On April 22, 1889, a banker from Milbank, S. Dak., D. W. Diggs, wrote the Secretary of the Interior:

"[The Lake Traverse Reservation] is a great detriment to our interests, as it blocks the progress of two or three lines of railroad that we are very anxious to see completed.

"We need these roads badly, and the opening of the reservation would give new impetus to immigration which has been attracted by government lands further west.

"Any information that will enable the citizens of this section to render any service that may be needed in hastening the opening will be appreciated." National Archives Records of the Bureau of

432

ment had altered its general policy toward the Indian tribes. After 1871, the tribes were no longer regarded as sovereign nations, and the Government began to regulate their affairs through statute or through contractual agreements ratified by statute.[9] In 1887, the General Allotment Act (or Dawes Act) was enacted in an attempt to reconcile the Government's responsibility for the Indians' welfare with the desire of non-Indians to settle upon reservation lands.[10] The Act empowered the President to allot portions of reservation land to tribal members and, with tribal consent, to sell the surplus lands to white settlers, with the proceeds of these sales being dedicated to the Indians' benefit. See *Mattz* v. *Arnett,* 412 U. S., at 496–497.

Against this background, a series of negotiations took place in 1889 with the objective of opening the Lake

Indian Affairs, Record Group No. 75, Letters Received; Special Case 147 (Sisseton), Letter No. 26163–1889, encls. 2, 3, and 5.

In an enclosed "resolution," Diggs and six other local, non-Indian citizens from the counties adjacent to the reservation promised to use their influence to secure to the tribe further congressional appropriations, mentioned in the 1867 Treaty, Art. VI, as compensation for the tribe's loyalty during the 1862 Sioux uprising. The evident goal of the effort was to assure tribal consent to an agreement opening the reservation to settlement and development.

On December 13, 1890, while the cession Agreement of 1889 was still before Congress, the Governor of South Dakota wrote the Secretary of the Interior that the tribe was in a "destitute condition" and urged that the Government "at once take steps to relieve the necessities [of] this long suffering people . . . slowly suffering death from privation and starvation." National Archives Records of the Bureau of Indian Affairs, Record Group No. 75, Letters Received: Special Case 147 (Sisseton), Letter No. 39462–1890.

[9] Act of Mar. 3, 1871, c. 120, § 1, 16 Stat. 566. But that Act did not purport to invalidate or impair any prior treaty obligation incurred by the United States toward an Indian tribe. 25 U. S. C. § 71.

[10] Act of Feb. 8, 1887, c. 119, 24 Stat. 388.

Traverse Reservation to settlement. In April of that year, a South Dakota banker, D. W. Diggs, sent to the Secretary of the Interior a request on behalf of the local white community that reservation lands be made available for commerce, farming, and railroad development.[11] In May, Diggs met with a council of tribal leaders, who told him that the tribe would consider selling the reserved lands if the Government would first pay a "loyal scout claim" which the tribe believed was owing as part of the 1867 Treaty. Spokesmen for the tribe were quoted in the local press that month as follows:

> "We never thought to keep this reservation for our lifetime.
>
> .  .  .  .  .
>
> ". . . Now that South Dakota has come in as a state we have some one to go to, to right our wrongs. The Indians have taken their land in severalty. They are waiting for patents. The Indians are anxious to get patents. We are willing the surplus land should be sold. We don't expect to keep reservation. We want to get the benefit of the sale. If the government will pay what they owe, we will be pleased with the opening. There will be left over allotments 880,000 acres. If the government pays what they owe, and pay what they agree per acre, we will be pleased with the opening. When the government asks me to do anything, I am always willing to do it. I hope you will try to get the government to do what is right.
>
> "If the government will do this, it will benefit both the Indians and the whites [and illustrates by holding up half a dozen keys [in a] perpendicular position, separately], we all stand this way [and

---

[11] See n. 8, *supra*.

then, pressing them against each other], we will be as one key. When the reservation is open we meet as one body. We be as one.

.        .        .        .        .

". . . If we get the money we will open up. Your committee needn't be discouraged, we will open up.

". . . We are anxious to become citizens and vote. We have laid before you all we have to say from our hearts. . . ." [12]

By summer, the Commissioner of Indian Affairs had apparently been won over, for in August 1889, he sent to the Secretary of the Interior a set of draft instructions for the guidance of a Commission to negotiate with the Sisseton and Wahpeton Indians for the sale of their surplus lands.[13] The instructions noted that the negotiations would be pursuant to § 5 of the General Allotment Act, that the allotment of individual tracts of reservation land to tribal members was already "virtually . . . completed," and that "the Indians desire to sell a portion at least of their surplus [*i. e.,* unallotted] lands."

While these proposed instructions suggested that sale of all the surplus lands might be "inadvisable," the negotiations in fact proceeded toward such a total sale. The three Government representatives [14] were appointed in November, and two weeks of meetings at the reservation promptly ensued. The proceedings at these meet-

---

[12] The Minneapolis Tribune, May 22, 1889, p. 1 (reproduced in 1 App. for Respondent in No. 73–1148, p. 19).

[13] National Archives Records of the Bureau of Indian Affairs, Record Group No. 75, Land Division, Letter Book 188, Aug. 13, 1889.

[14] Charles A. Maxwell, Chief of the Land Division of the Department of the Interior, Eliphalet Whittlesey, Secretary of the Board of Indian Commissioners, and D. W. Diggs.

435

ings were transcribed,[15] and the records show that the Indians wished to sell outright all of their unallotted lands, on three conditions: that each tribal member, regardless of age or sex, receive an allotment of 160 acres; that Congress appropriate moneys to make good on the tribe's outstanding "loyal scout claim"; and that an adequate sales price per acre be arrived at for all of the unallotted land.[16]

---

[15] See the Report of councils with Sisseton and Wahpeton Indians in S. Exec. Doc. No. 66, 51st Cong., 1st Sess., 15–29 (1890) (Councils Report).

[16] The Government negotiators reported to the Commissioner of Indian Affairs that they had "advised them [the tribe] that we proposed to give $2.50 per acre for each and every acre of the lands which they desired to dispose of . . . ." Letter to Commissioner, Dec. 1889, S. Exec. Doc. No. 66, supra, at 7. The report continued: "We first proposed to reserve one section in each township for school purposes, and certain other portions of the reservation for future allotments and the tracts now occupied by the Government for agency and school purposes, and also such tracts as were occupied and used for educational and missionary purposes among the Indians, but upon informal inquiry among the Indians it was learned that this plan would not meet with their approval. They argued that as the money, interest, and perhaps some of the principal of the funds arising from the sale of the surplus lands were to be used for educational and civilization purposes, it would not be proper for them also to reserve a large quantity of land for educational and Government purposes, and admitting the force of the argument we did not press the matter, believing it better that the Government should own the lands upon which the agency and school buildings are located, and that missionary societies and churches should have the privilege of purchasing the land now occupied by them. We also learned that the Indians preferred to have the allotments equalized so that each person, including married women, would have 160 acres, the plan outlined in your annual report, and sell all the surplus lands remaining, and hence the provisions of article four." Ibid.

The sale of all unallotted lands was not an irrational choice in light of the unusually large number of allotments which the Agree-

In December, an Agreement was reached and the contract was signed by the required majority of male adult tribal members. Its terms [17] were accurately summa-

---

ment specified. President Harrison later noted this in submitting the 1889 Agreement to the Congress:

"This agreement involves a departure from the terms of the general allotment act in at least one important particular. It gives to each member of the tribe 160 acres of land without regard to age or sex, while the general law gives this allotment only to heads of families." *Id.,* at 1.

During the negotiations, the intent of all parties to effect a clear conveyance of all unallotted lands was evident. For instance, on December 3, 1889, Gabriel Renville, a tribal spokesman, stated:

"I have spoken for all of the people, and it is their wish that I should say these things. In the past there has been lots of land sold, but we have not been benefited by the sales. In 1867 they promised us they would help us, but they have not helped us very much for many years. Let them first settle our claim [loyal scout claim] and then we will talk about our surplus lands. We are now citizens and can talk with you as such, and do not care to talk about shoe pacs, etc., but cash. We can buy for ourselves what we need if payment is made in cash, and then we do not care to have an agency here after the surplus lands have been sold. The people have asked me to say this as their wish." Councils Report 19-20.

Michael Renville, another tribal spokesman, stated:

"We have always said that when the sale of surplus lands was considered we would ask that 160 acres be given to each member of the tribe . . . . We said in council that we would not sell surplus lands until back annuities [for the loyal scout claim] were paid, but you say that if the lands are now sold the back annuities would be paid at the same time. This pleases us." *Id.,* at 21.

In explaining a proposed draft of the agreement to the tribal members, negotiator Whittlesey noted:

"After you have received your back annuities, each receive 160 acres of land; you will sell all that is left . . . . There are 918,000 acres in the reservation, about 127,000 acres now allotted; it will take, we think, about 130,000 to complete allotments; that will leave about 660,000 acres to sell." *Id.,* at 22.

The Indians were aware that they were taking a not insignificant step in selling the reservation lands. Gabriel Renville stated:

"This little reservation is ours, and all we have left. There is

rized by the Commissioner of Indian Affairs in his report
to the Secretary of the Interior: [18]

> "By article 1, the Indians cede, sell, relinquish,
> and convey to the United States all the unallotted
> land within the reservation remaining after the allot-
> ments and additional allotments provided for in
> article 4 shall have been made.
>
> "Article 2 provides that the United States will
> pay to the Indians $2.50 per acre for the lands ceded.
>
> "Article 3 provides for the payment of back
> annuities, and continues the annuities of $18,400
> until July 1, 1901.
>
> "Article 4 provides for the equalization of allot-
> ments so that each person, including married women,
> shall have 160 acres."

President Harrison immediately submitted the Agree-
ment to Congress for legislative approval. While the

---

nothing in our treaty that says that we must sell. It was given us
as a permanent home, but now we have decided to sell . . . ." *Id.*,
at 25.

In explaining the final agreement to the Secretary of the Interior,
the Commissioner of Indian Affairs noted:

"The reservation contains 918,780 acres, and there have been
127,887 acres allotted, but all the Indians who are entitled have not
yet received their allotments. It is almost impossible to give the
accurate number of Indians entitled to allotments, for since the al-
lotments were completed numerous applications have been made for
land, and as before stated, it is known that all who are entitled have
not received allotments. I think, taking these facts into considera-
tion, that these people number between 1,500 and 1,600 souls, and
taking the latter as a basis of calculation, it will require about 128,000
acres to make allotments and additional allotments provided for,
making a total of 256,000 acres, leaving 662,780 acres to which the
Indian title is extinguished by the terms of the agreement." Letter
to the Secretary, S. Exec. Doc. No. 66, *supra*, at 4–5.

[17] The Agreement is reprinted as Appendix B to this opinion.
[18] S. Exec. Doc. No. 66, *supra*, at 3.

subsequent legislative history is largely irrelevant to the issues before us, three aspects bear notice. First, the several committee reports which commented on the Agreement recognized that it effected a simple and unqualified cession of all of the unallotted lands to the United States for a sum certain.[19] Second, the Congress recognized that the Agreement could not be altered, and therefore debate centered largely on the disposition to be made by the United States of the lands it had acquired under the Agreement; it was decided that these lands

---

[19] For instance, a report of the Senate Committee on Indian Affairs summarized the Agreement as follows:

"By the terms of this Agreement the said bands of Indians agreed to cede, sell, relinquish, and convey to the United States the unallotted lands within the Lake Traverse Reservation."

"As to the equalization of allotments on the basis of 160 acres, provided in the bill, when viewed in the light of the fact that the additional allotments are in lieu of any residue which, under their title, these Indians could have reserved for the future benefit of their families, and the further fact that they are soon to assume the responsibilities of citizenship, with all it implies respecting the moral and material welfare of their families, we think that the departure from the general allotment act of 1887 in the case of these Indians is just and proper and should be allowed . . . .

"This reservation contains 918,780 acres of agricultural lands, 127,887 of which have been allotted to the Sisseton and Wahpeton Indians under the act of Congress approved February 8, 1887 (24 Stats., 388). The additional allotments, as provided in article 4 of the agreement, will require 112,113 acres, making a total of 240,002 acres, which leaves a surplus, including the lands occupied by the agency and missionary societies, of 678,778 acres, the Indian title to which will be extinguished by the terms of the agreement. The cost of the purchase, at $2.50 per acre, will amount to $1,696,945, which is to be a trust fund held by the United States for the benefit of these Indians. The appropriation named in the bill is estimated to cover the purchase, and pay the back annuities." S. Rep. No. 661, 51st Cong., 1st Sess., 1, 3–4 (1890).

Almost identical language appears in H. R. Rep. No. 1356, 51st Cong., 1st Sess., 1, 8–9 (1890).

should be sold to settlers at \$2.50 per acre under the homestead laws.[20] Third, the Congress included the Sisseton-Wahpeton Agreement in a comprehensive Act which also ratified several other agreements providing for the outright cession of surplus reservation lands to the Government.[21] The other agreements employed cession language virtually identical to that in the Sisseton-Wahpeton Agreement, but in these other cases the Indians sold only a described portion of their lands, rather than all "unallotted" portions, the result being merely a reduction in the size of the affected reservations.[22] The intended effect of all of these ratification

[20] Act of Mar. 3, 1891, § 30, 26 Stat. 1039. See 22 Cong. Rec. 2809–2810, 3784 (1891) (remarks of Congs. Holmann and Perkins); *id.*, at 3453, 3457–3458 (1891) (remarks of Sens. Pettigrew and Dawes).

[21] Act of Mar. 3, 1891, 26 Stat. 989. The other agreements ratified were negotiated with the following tribes: the Citizen Band of Pottawatomie Indians, § 8, 26 Stat. 1016; the Absentee Shawnee Indians, § 9, 26 Stat. 1018; the Cheyenne and Arapahoe Tribes, § 13, 26 Stat. 1022; the Coeur d'Alene Indians (I), § 19, 26 Stat. 1026; the Coeur d'Alene Indians (II), § 20, 26 Stat. 1029; the Gros Ventres, Mandans, and Arickarees, § 23, 26 Stat. 1032; the Crow Indians, § 31, 26 Stat. 1039.

[22] The Sisseton-Wahpeton Agreement provided that the tribe agreed to "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation. . . ." 26 Stat. 1036. The language in the other agreements ratified at the same time is comparable:

"—cede, relinquish, and forever and absolutely surrender to the United States all their claim, title and interest of every kind and character in and to the following described tract of country . . . ." 26 Stat. 1016 (Citizen Band of Pottawatomie Indians).

"—cede, relinquish and surrender, forever and absolutely, to the United States, all their claim, title and interest of every kind and character in and to the following described tract of country . . . ." 26 Stat. 1019 (Absentee Shawnee Indians).

"—cede, convey, transfer, relinquish, and surrender forever and absolutely, without any reservation whatever, express or implied, all

agreements was made clear by the sponsors of the comprehensive legislation:

"All the pending agreements or treaties for the purchase of Indian lands are ratified and confirmed by the provisions of this bill. . . .

"The bill carries the largest appropriation ever carried by an Indian appropriation bill, but it extinguishes the Indian title to a great domain and opens it to settlement by the hardy and progessive pioneers . . . ." [23]

"We do not pretend to make any modification or amendment of the agreements themselves. We merely ratify those, and then we take the estate we have acquired in this way, and after providing for the payment of the money, or whatever it is we have agreed to pay these Indians, we take these landed estates and parcel and divide them out among

their claim, title, and interest of every kind and character, in and to the lands embraced in the following described tract of country . . . ." 26 Stat. 1022 (Cheyenne and Arapahoe Tribes).

"—cede, grant, relinquish, and quitclaim to the United States all right, title, and claim which they now have, or ever had, to all lands in said·Territories and elsewhere, except the portion of land within the boundaries of their present reservation in the Territory of Idaho . . . ." 26 Stat. 1027 (Coeur d'Alene Indians (I)).

"—cede, grant, relinquish, and quitclaim to the United States, all the right, title, and claim which they now have, or ever had, to the following-described portion of their reservation . . . ." 26 Stat. 1030 (Coeur d'Alene Indians (II)).

"—cede, sell, and relinquish to the United States all their right, title, and interest in and to all that portion of the Fort Berthold Reservation [as herein described] . . . ." 26 Stat. 1032 (Gros Ventres, Mandans, and Arickarees).

"—agree to dispose of and sell to the Government of the United States, for certain considerations hereinafter mentioned, all that portion of the Crow Indian Reservation [as herein described] . . . ." 26 Stat. 1040 (Crow Indians).

[23] Remarks of Cong. Perkins, 22 Cong. Rec. 3784 (1891).

the people in a fashion that we think is the most conducive to the occupancy of that country by an honest, laborious, earnest, and faithful set of people." [24]

"The remainder of the bill is made up of the other appropriations necessary to carry out the agreements that were made with Indians for the surrender of a large portion of their reservations to the public domain. In the main it has cost the United States between $1.25 and $1.50 an acre for some ten or eleven million acres of land. All this land is opened by this bill to settlement as part of the public domain upon the payment by the settler of $1.50 an acre, for all except that which was obtained from the Sisseton and Wahpeton reservation, which is open to settlement at $2.50 an acre, because the United States gave the Indians for the surrender $2.50 an acre." [25]

As passed by the Congress, the 1891 Act recited and ratified the 1889 Agreement with the tribe and appropriated $2,203,000 to pay the tribe for the ceded land and to make good the tribe's "loyal scout" claim. § 27, 26 Stat. 1038. A portion of the moneys was made available for immediate distribution to tribal members, on a per capita basis, and the remaining funds were, as had been agreed, "placed in the Treasury of the United States, to the credit of said . . . Indians [at five percent interest] . . . for the education and civilization of said bands of Indians or members thereof." § 27, 26 Stat. 1039. The Act further provided that the 160-acre allotments were to be effected "as soon as practicable," pursuant to the terms of the General Allotment Act. § 29, 26 Stat. 1039. Finally, the Act provided that upon payment of

[24] Remarks of Sen. Morgan, id., at 3455.
[25] Remarks of Sen. Dawes, id., at 3879.

the per capita purchase moneys to the tribe, and the completion of the enlarged allotment process, "the lands by said agreement ceded, sold, relinquished, and conveyed to the United States" shall be opened "only to entry and settlement [at $2.50 per acre] under the homestead and townsite laws of the United States, excepting the sixteenth and thirty-sixth sections of said lands, which shall be reserved for common school purposes, and be subject to the laws of the State wherein located," § 30, 26 Stat. 1039.

On April 11, 1892, President Harrison declared open for settlement all "lands embraced in said reservation, saving and excepting the lands reserved for and allotted to said Indians." [26] The ceded lands were rapidly purchased and settled by non-Indians.

The jurisdictional history subsequent to the 1891 Act is not wholly clear, but it appears that state jurisdiction over the ceded (*i. e.,* unallotted) lands went virtually unquestioned until the 1960's. The Lake Traverse Reservation was eliminated from the maps published by the Commissioner of Indian Affairs until 1908; thereafter, some Government maps included the area as an "open" or "former" reservation, while more recent ones have characterized it simply as a "reservation." [27] Federal Indian agents have remained active in the area, and Con-

---

[26] Proclamation of the President, Apr. 11, 1892, 27 Stat. 1017.

[27] Compare the maps contained in the Annual Reports of the Commissioner of Indian Affairs for 1892, 1909, and 1918, with the Map of Indian Lands and Related Facilities as of 1971, compiled by Bureau of Indian Affairs in cooperation with the Geological Survey, U. S. Dept. of Interior. The parties here have cited us to numerous Interior Department memoranda and letters, issued over the past 80-odd years, which refer to the area either as a "reservation" or a "former reservation." No consistent pattern emerges. The authors of these documents appear to have put no particular significance on their choice of a label.

gress has regularly appropriated funds for the tribe's welfare; [28] the allotted Indian tracts have retained their "trust" status pursuant to periodic Executive Orders.[29] A tribal constitution did not appear until 1946, and tribal jurisdiction under it extended only to "Indian-owned lands lying in the territory within the original confines of the Sisseton-Wahpeton Lake Traverse Sioux Reservation." [30]   In 1963, the Court of Appeals for the Eighth Circuit held that the 1891 Act had terminated the reservation; in the process, the court noted that "the highest court of that state [South Dakota] has repeatedly held that South Dakota has jurisdiction," and that the Justice Department had taken a like position. *DeMarrias* v. *South Dakota,* 319 F. 2d, at 846.

But the Commissioner of Indian Affairs approved a new tribal constitution in 1966, which stated: "The jurisdiction of the Sisseton-Wahpeton Sioux Tribe shall extend to lands lying in the territory within the original confines of the Lake Traverse Reservation as described in Article III of the Treaty of February 19, 1867." [31]   Apparently, however, no tribal court or legal code was established to exercise this jurisdiction.   In 1972, a field

---

[28] See, *e. g.,* 39 Stat. 988 and 42 Stat. 576.

[29] See Exec. Orders Nos. 1916 (1914), 3994 (1924), 7984 (1938). See also the delegated orders of the Secretary of the Interior, at 28 Fed. Reg. 11630 (1963), 33 Fed. Reg. 15067 (1968), and 38 Fed. Reg. 34463 (1973). The delegation of authority was by Executive Order No. 10250 (June 5, 1951), 3 CFR 755–757 (1949–1953 Comp.). Congress has several times authorized extensions of trust relations with respect to Indian tribes, *e. g.,* Acts of June 21, 1906, 34 Stat. 326, and Mar. 2, 1917, 39 Stat. 976.

[30] Art. I, Constitution and Bylaws of the Sisseton-Wahpeton Sioux Tribe, approved by the Commissioner of Indian Affairs, Oct. 16, 1946.

[31] Art. I, Revised Constitution and Bylaws of the Sisseton-Wahpeton Sioux Tribe, approved by the Commissioner of Indian Affairs, Aug. 26, 1966.

solicitor for the Department of the Interior rendered an opinion that the 1891 Act had not extinguished tribal jurisdiction over the 1867 reservation lands.[32]   In 1973, the Court of Appeals overruled *DeMarrias,* in the decision here under review, and in early 1974, after several months of preparation, the tribe formally established a law court and a legal code to exercise civil and criminal jurisdiction throughout the 1867 reservation lands.

## III

This Court does not lightly conclude that an Indian reservation has been terminated.   "[W]hen Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress."   *United States* v. *Celestine,* 215 U. S. 278, 285.   The congressional intent must be clear, to overcome "the general rule that '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.' "   *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 174, quoting *Carpenter* v. *Shaw,* 280 U. S. 363, 367.   Accordingly, the Court requires that the "congressional determination to terminate . . . be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history."   *Mattz* v. *Arnett,* 412 U. S., at 505.   See also *Seymour* v. *Superintendent,* 368 U. S. 351, and *United States* v. *Nice,* 241 U. S. 591.   In particular, we have stressed that reservation status may survive the mere opening of a reservation to settlement, even when the moneys paid for the land by the settlers are placed in trust by the Government for the Indians' benefit.   *Mattz* v. *Arnett, supra,* and *Seymour* v. *Superintendent, supra.*

---

[32] Boundaries of the Lake Traverse Indian Reservation, Field Solicitor's Opinion, Aberdeen Office, Bureau of Indian Affairs, Aug. 16, 1972.

But in this case, "the face of the Act," and its "surrounding circumstances" and "legislative history," all point unmistakably to the conclusion that the Lake Traverse Reservation was terminated in 1891. The negotiations leading to the 1889 Agreement show plainly that the Indians were willing to convey to the Government, for a sum certain, all of their interest in all of their unallotted lands. See *supra*, at 432–437. The Agreement's language, adopted by majority vote of the tribe, was precisely suited to this purpose:

> "The Sisseton and Wahpeton bands of Dakota or Sioux Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said bands of Indians as aforesaid remaining after the allotments and additional allotments provided for in article four of this agreement shall have been made." [33]

---

[33] Agreement of 1889, Art. I, 26 Stat. 1036.

Counsel for the State has argued that the "school lands" provision of the 1891 Act, § 30, 26 Stat. 1039, is further evidence of Congress' intent to vest jurisdiction over unallotted lands in the State. Counsel for the tribal members would have us draw a contrary inference from the provision. The provision reads:

"That the lands by said agreement ceded, sold, relinquished, and conveyed to the United States shall immediately, upon the payment to the parties entitled thereto of their share of the funds made immediately available by this act, and upon the completion of the allotments as provided for in said agreement, be subject only to entry and settlement under the homestead and townsite laws of the United States, excepting the sixteenth and thirty-sixth sections of said lands, which shall be reserved for common school purposes, *and be subject to the laws of the State wherein located . . . .*" (Emphasis added.)

Counsel differ as to whether the emphasized phrase refers to the "lands by said agreement ceded, sold, relinquished, and conveyed to the United States," or to "the sixteenth and thirty-sixth sections of said lands." We think the disagreement irrelevant to the juris-

This language is virtually indistinguishable from that used in the other sum-certain, cession agreements ratified by Congress in the same 1891 Act. See nn. 21 and 22, *supra*. That the lands ceded in the other agreements were returned to the public domain, stripped of reservation status, can hardly be questioned, and every party here acknowledges as much. The sponsors of the legislation stated repeatedly that the ratified agreements would return the ceded lands to the "public domain." See *supra*, at 440–441. Cf. *Mattz v. Arnett*, 412 U. S., at 504 n. 22.

It is true that the Sisseton-Wahpeton Agreement was unique in providing for cession of all, rather than simply a major portion of, the affected tribe's unallotted lands. But, as the historical circumstances make clear, this was not because the tribe wished to retain its former reservation, undiminished, but rather because the tribe and the Government were satisfied that retention of allotments would provide an adequate fulcrum for tribal affairs. In such a situation, exclusive tribal and federal jurisdiction is limited to the retained allotments. 18

---

dictional issue before us. The "school provision" was not part of the 1889 Agreement, and there is no indication in the legislative history that Congress intended the provision to qualify the terms of the cession of unallotted lands to the Government. In opening public lands to settlement, it was the usual practice of Congress to except the 16th and 36th sections from settlement and to reserve these to the State for common school purposes. Indeed, the 1891 Act contains an omnibus "school provision," applicable to all the agreements ratified therein, which reiterates this purpose. § 38, 26 Stat. 1044. Even if we were to assume, with counsel for the tribal members, that the "state law" phrase of § 30 refers only to school lands, the natural inference would be that state law is to govern the manner in which the 16th and 36th sections are to be employed "for common school purposes." This implies nothing about the presence or absence of state civil and criminal jurisdiction over the remainder of the ceded lands.

U. S. C. § 1151 (c). See *United States* v. *Pelican,* 232 U. S. 442. With the benefit of hindsight, it may be argued that the tribe and the Government would have been better advised to have carved out a diminished reservation, instead of or in addition to the retained allotments. But we cannot rewrite the 1889 Agreement and the 1891 statute. For the courts to reinstate the *entire* reservation, on the theory that retention of mere allotments was ill-advised, would carry us well beyond the rule by which legal ambiguities are resolved to the benefit of the Indians. We give this rule the broadest possible scope, but it remains at base a canon for construing the complex treaties, statutes, and contracts which define the status of Indian tribes. A canon of construction is not a license to disregard clear expressions of tribal and congressional intent.

The Court of Appeals thought that a finding of termination here would be inconsistent with *Mattz* and *Seymour.* This is not so. We adhere without qualification to both the holdings and the reasoning of those decisions. But the gross differences between the facts of those cases and the facts here cannot be ignored.

In *Mattz,* the Court held that an 1892 Act of Congress [34] did not terminate the Klamath River Indian Reservation in northern California. That Act declared the reservation lands "subject to settlement, entry, and purchase" under the homestead laws of the United States, empowered the Secretary of the Interior to allot tracts to tribal members, and provided that any proceeds of land sales to settlers should be placed in a fund for the tribe's benefit. The 1892 statute could be considered a termination provision only if continued reservation status were inconsistent with the mere opening of lands to settlement, and such is not the case. See 18 U. S. C. § 1151 (a).

---

[34] Act of June 17, 1892, 27 Stat. 52.

But the 1891 Act before us is a very different instrument. It is not a unilateral action by Congress but the ratification of a previously negotiated agreement, to which a tribal majority consented. The 1891 Act does not merely open lands to settlement; it also appropriates and vests in the tribe a sum certain—$2.50 per acre—in payment for the express cession and relinquishment of "all" of the tribe's "claim, right, title and interest" in the unallotted lands. The statute in *Mattz*, by contrast, benefited the tribe only indirectly, by establishing a fund dependent on uncertain future sales of its land to settlers. See also *Ash Sheep Co.* v. *United States,* 252 U. S. 159, 164–166. Furthermore, the circumstances surrounding congressional action in *Mattz* militated persuasively against a finding of termination. That action represented a clear retreat from previous congressional attempts to vacate the Klamath River Reservation in express terms; and the Department of the Interior had consistently regarded the Klamath River Reservation as a continuing one, despite the 1892 legislation. *Mattz* v. *Arnett, supra,* at 503–505. In the present case, by contrast, the surrounding circumstances are fully consistent with an intent to terminate the reservation, and inconsistent with any other purpose.

In *Seymour,* the Court held that a 1906 Act of Congress[35] did not terminate the southern portion of the Colville Indian Reservation in Washington. Like that in question in *Mattz,* this Act was unilateral in character; like that in question in *Mattz,* it merely opened reservation land to settlement and provided that the uncertain future proceeds of settler purchases should be applied to the Indians' benefit. The *Seymour* Court was not confronted with a straightforward agreement ceding lands to the Government for a sum certain. In *Seymour,* the Court sharply contrasted the 1906 Act, which provided

[35] 34 Stat. 80.

only for non-Indian settlement, with an 1892 Act, which plainly " 'vacated' " and restored " 'to the public domain' " the northern portion of the Colville Reservation. *Seymour* v. *Superintendent,* 368 U. S., at 355. The 1891 Act before us here is analogous to that 1892 statute.

Thus, in finding a termination of the Lake Traverse Reservation, we are not departing from, but following and reaffirming, the guiding principles of *Mattz* and *Seymour.*

Until the Court of Appeals altered the status quo, South Dakota had exercised jurisdiction over the unallotted lands of the former reservation for some 80 years. Counsel for the tribal members stated at oral argument that many of the Indians have resented state authority and suffered under it. Counsel for the State denied this and argued that an end to state jurisdiction would be calamitous for all the residents of the area, Indian and non-Indian alike. These competing pleas are not for us to adjudge, for our task here is a narrow one. In the 1889 Agreement and the 1891 Act ratifying it, Congress and the tribe spoke clearly. Some might wish they had spoken differently, but we cannot remake history.

The judgment in No. 73–1148 is affirmed, and that in No. 73–1500 is reversed.

*It is so ordered.*

## APPENDIX A TO OPINION OF THE COURT

### TREATY OF FEB. 19, 1867, 15 STAT. 505, AS AMENDED, 15 STAT. 509

Whereas it is understood that a portion of the Sissiton and Warpeton bands of Santee Sioux Indians, numbering from twelve hundred to fifteen hundred persons, not only preserved their obligations to the government of the United States, during and since the outbreak of the Medewakantons and other bands of Sioux in 1862, but

freely perilled their lives during that outbreak to rescue the residents on the Sioux reservation, and to obtain possession of white women and children made captives by the hostile bands; and that another portion of said Sissiton and Warpeton bands, numbering from one thousand to twelve hundred persons, who did not participate in the massacre of the whites in 1862, fearing the indiscriminate vengeance of the whites, fled to the great prairies of the northwest, where they still remain; and

Whereas Congress, in confiscating the Sioux annuities and reservations, made no provision for the support of these, the friendly portion of the Sissiton and Warpeton bands, and it is believed [that] they have been suffered to remain homeless wanderers, frequently subject to intense suffering from want of subsistence and clothing to protect them from the rigors of a high northern latitude, although at all times prompt in rendering service when called upon to repel hostile raids and to punish depredations committed by hostile Indians upon the persons and property of the whites; and

Whereas the several subdivisions of the friendly Sissitons and Warpeton bands ask, through their representatives, that their adherence to their former obligations of friendship to the government and people of the United States be recognized, and that provision be made to enable them to return to an agricultural life and be relieved from a dependence upon the chase for a precarious subsistence: therefore,

A treaty has been made and entered into, at Washington city, District of Columbia, this nineteenth day of February, A. D. 1867, by and between Lewis V. Bogy, Commissioner of Indian Affairs, and William H. Watson, commissioners, on the part of the United States, and the undersigned chiefs and headmen of the Sissiton and

Warpeton bands of Dakota or Sioux Indians, as follows, to wit:

ARTICLE I. The Sissiton and Warpeton bands of Dakota Sioux Indians, represented in council, will continue their friendly relations with the government and people of the United States, and bind themselves individually and collectively to use their influence to the extent of their ability to prevent other bands of Dakota or other adjacent tribes from making hostile demonstrations against the government or people of the United States.

ARTICLE II. The said bands hereby cede to the United States the right to construct wagon roads, railroads, mail stations, telegraph lines, and such other public improvements as the interest of the government may require, over and across the lands claimed by said bands (including their reservation as hereinafter designated) over any route or routes that *that* may be selected by authority of the government, said lands so claimed being bounded on the south and east by the treaty line of 1851 and the Red river of the North to the mouth of Goose river, on the north by the Goose river and a line running from the source thereof by the most westerly point of Devil's lake to the Chief's Bluff at the head of James river, and on the west by the James river to the mouth of Mocasin river, and thence to Kampeska lake.

ARTICLE III. For and in consideration of the cession above mentioned, and in consideration of the faithful and important services said to have been rendered by the friendly bands of Sissitons and Warpetons Sioux here represented, and also in consideration of the confiscation of all their annuities, reservations, and improvements, it is agreed that there shall be set apart for the members of said bands who have heretofore surrendered to the authorities of the government, and were not sent to the Crow Creek reservation, and for the members of said

bands who were released from prison in 1866, the following described lands as a permanent reservation, viz.:

Beginning at the head of Lake Travers[e], and thence along the treaty line of the treaty of 1851 to Kampeska lake; thence in a direct line to Reipan or the northeast point of the Coteau des Prairie[s], and thence passing north of Skunk lake, on the most direct line to the foot of Lake Traverse, and thence along the treaty line of 1851 to the place of beginning.

ARTICLE IV. It is further agreed that a reservation be set apart for all other members of said bands who were not sent to the Crow Creek reservation, and also for the Cut head bands of Yanktonais Sioux, a reservation bounded as follows, viz.:

Beginning at the most easterly point of Devil's lake; thence along the waters of said lake to the most westerly point of the same; thence on a direct line to the nearest point on the Cheyenne river; thence down said river to a point opposite the lower end of Aspen island, and thence on a direct line to the place of beginning.

ARTICLE V. The said reservations shall be apportioned in tracts of (160) one hundred and sixty acres to each head of a family, or single person over the age of (21) twenty-one years, belonging to said bands, and entitled to locate thereon, who may desire to locate permanently and cultivate the soil as a means of subsistence: each (160) one hundred and sixty acres so allotted to be made to conform to the legal subdivisions of the government surveys, when such surveys shall have been made; and every person to whom lands may be allotted under the provisions of this article who shall occupy and cultivate a portion thereof for five consecutive years shall thereafter be entitled to receive a patent for the same so soon as he shall have fifty acres of said tract fenced, ploughed, and in crop: *Provided,* [That] said patent shall not authorize

any transfer of said lands, or portions thereof, except to the United States, but said lands and the improvements thereon shall descend to the proper heirs of the persons obtaining a patent.

ARTICLE VI. And, further, in consideration of the destitution of said bands of Sissiton and Warpeton Sioux, parties hereto, resulting from the confiscation of their annuities and improvements, it is agreed that Congress will, in its own discretion, from time to time make such appropriations as may be deemed requisite to enable said Indians to return to an agricultural life under the system in operation on the Sioux reservation in 1862; including, if thought advisable, the establishment and support of local and manual labor schools; the employment of agricultural, mechanical, and other teachers; the opening and improvement of individual farms; and generally such objects as Congress in its wisdom shall deem necessary to promote the agricultural improvement and civilization of said bands.

ARTICLE VII. An agent shall be appointed for said bands, who shall be located at Lake Traverse; and whenever there shall be five hundred (500) persons of said bands permanently located upon the Devil's Lake reservation there shall be an agent or other competent person appointed to superintend at that place the agricultural, educational, and mechanical interests of said bands.

ARTICLE VIII. All expenditures under the provisions of this treaty shall be made for the agricultural improvement and civilization of the members of said bands authorized to locate upon the respective reservations, as hereinbefore specified, in such manner as may be directed by law; but no goods, provisions, groceries, or other articles—except materials for the erection of houses and articles to facilitate the operations of agriculture—shall be issued to Indians or mixed-bloods on either reservation

unless it be in payment for labor performed or for produce delivered: *Provided,* That, when persons located on either reservation, by reason of age, sickness, or deformity, are unable to labor, the agent may issue clothing and subsistence to such persons from such supplies as may be provided for said bands.

ARTICLE IX. The withdrawal of the Indians from all dependence upon the chase as a means of subsistence being necessary to the adoption of civilized habits among them, it is desirable that no encouragement be afforded them to continue their hunting operations as means of support, and, therefore, it is agreed that no person will be authorized to trade for furs or peltries within the limits of the land claimed by said bands, as specified in the second article of this treaty, it being contemplated that the Indians will rely solely upon agricultural and mechanical labor for subsistence, and that the agent will supply the Indians and mixed-bloods on the respective reservations with clothing, provisions, &c., as set forth in article eight, so soon as the same shall be provided for that purpose. And it is further agreed that no person not a member of said bands, parties hereto whether white, mixed-blood, or Indian, except persons in the employ of the government or located under its authority, shall be permitted to locate upon said lands, either for hunting, trapping, or agricultural purposes.

ARTICLE X. The chiefs and headmen located upon either of the reservations set apart for said bands are authorized to adopt such rules, regulations, or laws for the security of life and property, the advancement of civilization, and the agricultural prosperity of the members of said bands upon the respective reservations, and shall have authority, under the direction of the agent, and without expense to the government, to organize a force sufficient to carry out all such rules, regulations, or

laws, and all rules and regulations for the government of said Indians, as may be prescribed by the Interior Department: *Provided*, That all rules, regulations, or laws adopted or amended by the chiefs and headmen on either reservation shall receive the sanction of the agent.

## APPENDIX B TO OPINION OF THE COURT

## AGREEMENT OF 1889, RATIFIED BY THE ACT OF MAR. 3, 1891, 26 STAT. 1035

Whereas, by section five of the act of Congress entitled "An act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and Territories over the Indians, and for other purposes," approved February eighth, eighteen hundred and eighty-seven, it is provided "That at any time after lands have been allotted to all the Indian of any tribe, as herein provided, or sooner," if in the opinion of the President it shall be for the best interests of said tribe, it shall be lawful for the Secretary of the Interior to negotiate with such Indian tribe for the purchase and release by the said tribe, in conformity with the treaty or statute under which such reservation is held, of such portions of its reservations not allotted as such tribe shall from time to time, consent to sell, on such terms and conditions as shall be considered just and equitable between the United States and said tribe of Indians, which purchase shall not be complete until ratified by Congress; and the form and manner of executing such release shall also be prescribed by Congress.

Whereas the Sisseton and Wahpeton bands of Dakota or Sioux Indians are desirous of disposing of a portion of the land set apart and reserved to them by the third article of the treaty of February nineteenth, eighteen hundred and sixty-seven, between them and the United States,

and situated partly in the State of North Dakota and partly in the State of South Dakota:

Now, therefore, this agreement made and entered into in pursuance of the provisions of the Act of Congress approved February eighth, eighteen hundred and eighty-seven, aforesaid, at the Sisseton Agency, South Dakota, on this the twelfth day of December, eighteen hundred and eighty-nine, by and between Eliphalet Whittlesey, D. W. Diggs, and Charles A. Maxwell, on the part of the United States, duly authorized and empowered thereto, and the chiefs, head-men, and male adult members of the Sisseton and Wahpeton bands of Dakota or Sioux Indians, witnesseth:

### Article I.

The Sisseton and Wahpeton bands of Dakota or Sioux Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation set apart to said bands of Indians as aforesaid remaining after the allotments and additional allotments provided for in article four of this agreement shall have been made.

### Article II.

In consideration for the lands ceded, sold, relinquished, and conveyed as aforesaid, the United States stipulates and agrees to pay to the Sisseton and Wahpeton bands of Dakota or Sioux Indians, parties hereto, the sum of two dollars and fifty cents per acre for each and every acre thereof, and it is agreed by the parties hereto that the sum so to be paid shall be held in the Treasury of the United States for the sole use and benefit of the said bands of Indians; and the same, with interest thereon at three per centum per annum, shall be at all times subject to appropriation by Congress for the education and civilization of the said bands of Indians, or members thereof,

as provided in section five of an act of Congress, approved February eighth, eighteen hundred and eighty-seven, and entitled "An act to provided for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and Territories over the Indians, and for other purposes:" *Provided,* That any religious society or other organization now occupying, under proper authority, for religious or educational work among the Indians, any of the land in this agreement ceded, sold, relinquished, and conveyed shall have the right, for two years from the date of the ratification of this instrument, within which to purchase the lands so occupied at a price to be fixed by the Congress of the United States: *Provided further,* That the cession, sale, relinquishment, and conveyance of the lands described in article one of this agreement shall not take effect and be in force until the sum of three hundred and forty-two thousand seven hundred and seventy-eight dollars and thirty-seven cents, together with the sum of eighteen thousand and four hundred dollars, shall have been paid to said bands of Indians, as set forth and stipulated in article third of this agreement.

## Article III.

The United States stipulates and agrees to pay to the Sisseton and Wahpeton bands of Dakota or Sioux Indians, parties hereto, per capita, the sum of three hundred and forty-two thousand seven hundred and seventy-eight dollars and thirty-seven cents, being the amount found to be due certain members of said bands of Indians who served in the armies of the United States against their own people, when at war with the United States, and their families and descendants, under the provisions of the fourth article of the treaty of July twenty-third, eighteen hundred and fifty-one, and of which they have been

wrongfully and unjustly deprived by the operation of the provisions of an act of Congress approved February sixteenth, eighteen hundred and sixty-three, and entitled "An act for the relief of persons for damages sustained by reason of depredation, and injuries by certain bands of Sioux Indians"; said sum being at the rate of eighteen thousand four hundred dollars per annum from July first, eighteen hundred and sixty-two, to July first, eighteen hundred and eighty-eight less their pro rata share of the sum of six hundred and sixteen thousand and eighty-six dollars and fifty-two cents, heretofore appropriated for the benefit of said Sisseton and Wahpeton bands of Dakota or Sioux Indians, as set forth in report numbered nineteen hundred and fifty-three, of the House of Representatives, Fiftieth Congress, first session.

The United States further agrees to pay to said bands of Indians, per capita, the sum of eighteen thousand and four hundred dollars annually from the first day of July, eighteen hundred and eighty-eight, to the first day of July, nineteen hundred and one, the latter date being the period at which the annuities to said bands of Indians were to cease, under the terms of the fourth article of the treaty of July twenty-third, eighteen hundred and fifty-one, aforesaid; and it is hereby further stipulated and agreed that the aforesaid sum of three hundred and forty-two thousand seven hundred and seventy-eight dollars and thirty-seven cents, together with the sum of eighteen thousand and four hundred dollars, due the first day of July, eighteen hundred and eighty-nine, shall become immediately available upon the ratification of this agreement.

### ARTICLE IV.

It is further stipulated and agreed that there shall be allotted to each individual member of the bands of Indians, parties hereto, a sufficient quantity, which, with

the lands herctofore allotted, shall make in each case one hundred and sixty acres, and in case no allotment has been made to any individual member of said bands, then an allotment of one hundred and sixty acres shall be made to such individual, the object of this article being to equalize the allotments among the members of said bands, so that each individual, including married women, shall have one hundred and sixty acres of land; and patents shall issue for the lands allotted in pursuance of the provisions of this article, upon the same terms and conditions and limitations as is provided in section five of the act of Congress, approved February eighth, eighteen hundred and eighty-seven, hereinbefore referred to.

## ARTICLE V.

The agreement concluded with the said Sisseton and Wahpeton bands of Dakota or Sioux Indians, on the eighth day of December, eighteen hundred and eighty-four, granting a right of way through their reservation for the Chicago, Milwaukee and Saint Paul Railway, is hereby accepted, ratified and confirmed.

## ARTICLE VI.

This agreement shall not take effect and be in force until ratified by the Congress of the United States.

In witness whereof we have hereunto set our hands and seals the day and year above written.

ELIPHALET WHITTLESEY,
D. W. DIGGS,
CHAS. A. MAXWELL,
On the part of the United States.

The foregoing articles of agreement having been fully explained to us, in open council, we, the undersigned, being male adult members of the Sisseton and Wahpeton

bands of Dakota or Sioux Indians, do hereby consent and agree to all the stipulations, conditions, and provisions therein contained.

Simon Ananangmari (his x mark), and others

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

In my view South Dakota has no jurisdiction over either the civil suit in the first of these two cases or the criminal prosecutions involved in the second. The so-called jurisdictional acts took place in "Indian country" over which the federal regime has exclusive jurisdiction until and unless the United States relinquishes it, and that has not been done here. Here, as in *United States* v. *Mazurie*, 419 U. S. 544 (1975), the acts were done within "Indian country" as defined in 18 U. S. C. § 1151, for they occurred on land "within the limits of" an Indian reservation "notwithstanding the issuance of any patent . . . ."

Petitioner DeCoteau is an enrolled member of the Sisseton-Wahpeton Sioux Tribe against whom South Dakota brought dependency and neglect proceedings in the state courts, seeking to terminate her parental authority over her minor children, also enrolled members of the tribe. The parties stipulated that all of the facts relevant to the court's order took place on the Lake Traverse Reservation which was established under the Treaty of February 19, 1867, 15 Stat. 505. Approximately half of the incidents involved occurred on allotted Indian land, and half occurred on land patented to non-Indians. The South Dakota Supreme Court ruled that since some of the incidents pertaining to dependency and neglect occurred on nontrust land within the reservation, they happened on land in "non-Indian country." 87 S. D. 555, 561, 211 N. W. 2d 843, 846 (1973).

Petitioner Erickson is the warden of a South Dakota penitentiary having in custody the 10 respondents in No. 73–1500. They are all members of the Sisseton-Wahpeton Tribe, and their crimes were committed within the boundaries of the Lake Traverse Reservation but on land owned by non-Indians. The Court of Appeals, ruling on petitions for habeas corpus, held that South Dakota had no jurisdiction to try respondents, 489 F. 2d 99 (CA8 1973).

The Treaty of Feb. 19, 1867, granted these Indians a permanent reservation with defined boundaries and the right to make their own laws and be governed by them subject to federal supervision, 15 Stat. 505, as amended. No more is asked here; and it must be conceded that the jurisdictional acts took place within the contours of that reservation.

In 1889 these Indians and three commissioners entered into an Agreement that, to furnish the Indians the wherewithal to survive, some of their lands would be opened for settlement. S. Exec. Doc. No. 66, 51st Cong., 1st Sess., 19 (1890). That Agreement was the occasion for the Act of Mar. 3, 1891, 26 Stat. 1035. The 1891 Act sets forth the entire Agreement, which Agreement was made under the authority of the General Allotment Act of Feb. 18, 1887, 24 Stat. 388, authorizing the Secretary of the Interior, if the President approves, to negotiate with an Indian tribe for the acquisition by the United States of such portions of its lands which the tribe consents to sell on terms "considered just and equitable." § 5, 24 Stat. 389. The Indians undertook to sell all their claim "to all the unallotted lands within the limits of the reservation." 26 Stat. 1036. There is not a word to suggest that the boundaries of the reservation were altered. The proceeds of sale were to be used "for the education and civilization" of these Indians. § 27, 26 Stat. 1039. The

lands allotted were not for the general use of the United States but with the exception of school lands [1] were to be "subject only to entry and settlement under the homestead and townsite laws" as provided in § 30 of the Act. 26 Stat. 1039. The purpose was not to alter or change the reservation but to lure white settlers onto the reservation whose habits of work and leanings toward education would invigorate life on the reservation.[2]

---

[1] See 35 Cong. Rec. 3187, where Senator Gamble stated:

"Under the provisions of the enabling act authorizing the admission of the State of South Dakota into the Union, sections 16 and 36 in every township were reserved for school purposes. This provision did not apply to permanent Indian reservations, but became operative when the Indian title was extinguished and the lands restored to and became a part of the public domain. This would withdraw about 29,000 acres of these lands and would leave 387,000 acres to be opened to settlement, and which would be affected by the proposed amendment."

See also 38 Cong. Rec. 1423, where Congressman Burke said:

"I would state that under the enabling act under which the State of South Dakota was admitted to the Union it was provided that sections 16 and 36 in said State should be reserved for the use of the common schools of that State, and it further provided that as to the lands within an Indian reservation the provisions of that grant would not become operative until the reservation was extinguished and the land restored to the public domain. That enabling act was passed by Congress on the 22d day of February, 1889. In March of that same year Congress ratified a treaty with the Sioux Indians in South Dakota for the cession of something like ten or eleven millions of acres of land, and made an express appropriation, in accordance with the provisions of the enabling act, to pay outright out of the Treasury the money for sections 16 and 36 of that land at the price stipulated for in the treaty."

[2] A member of the Commission negotiating with the Indians stated:

"This reservation will be quickly settled by whites, bringing the arts of civilization, establishing schools in every township, so that you can send your children to school . . . . Another advantage is, that the whites will exchange work with you. This will enable you to

While doubtful clauses in agreements with Indians are resolved in favor of the Indians, see *Alaska Pacific Fisheries* v. *United States,* 248 U. S. 78, 89 (1918), there is no doubtful language in the Agreement or in the 1891 Act. We recently stated in *Mattz* v. *Arnett,* 412 U. S. 481, 504 n. 22 (1973), that Congress uses "clear language of express termination" to disestablish and diminish a reservation and restore it to the public domain "when that result is desired." Congress in the very Act that opened the instant reservation opened several other reservations also. But as respects them it used different language. In contrast to the instant reservation, one other tribe agreed to "cede, relinquish, and forever and absolutely surrender to the United States all their claim, title and interest of every kind and character in and to" a described tract.[3] Another agreed to "cede, convey, transfer, relinquish, and surrender forever and absolutely, without any reservation" all their claim, title, and interest in a described tract.[4] Another agreed to "cede, sell, and relinquish to the United States all their right, title, and interest in and to all that portion" of a named reservation as specifically described.[5] Another agreed to sell to the United States "all that portion" of the reservation described by metes and bounds.[6]

---

cultivate 50 acres where you now cultivate 10. There are other advantages which I have not mentioned. One is you will have towns and railroads and good markets near you. All this will make your lands more valuable. . . . You hitch the two together and the white man and the Indian will pull together." S. Exec. Doc. No. 66, 51st Cong., 1st Sess., 24 (1890).

[3] Citizen Band of Pottawatomie Indians, Act of Mar. 3, 1891, 26 Stat. 1016.

[4] Cheyenne and Arapahoe Indians, Act of Mar. 3, 1891, 26 Stat. 1022.

[5] Arickaree, Gros Ventre, and Mandan Indians, Act of Mar. 3, 1891, 26 Stat. 1032.

[6] Crow Indians, Act of Mar. 3, 1891, 26 Stat. 1040.

Congress made an unmistakable change when it came to the lands ceded in the instant case.

The dimensions of the tragedy inflicted by today's decision are made apparent by the facts pertaining to the management of this reservation.

This tribe is a self-governing political community, a status which is not lightly impaired, *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 168 (1973); *Williams* v. *Lee,* 358 U. S. 217, 220 (1959). The South Dakota decision limits tribal jurisdiction to the "closed" portion of the reservation. That tears the reservation asunder. The only provision of the 1891 Act which extends state jurisdiction into the reservation is a clause in § 30 which exempts sections 16 and 36 and reserves them "for common school purposes," and makes them "subject to the laws of the State wherein located." That language was deemed necessary because the South Dakota Enabling Act did not reserve the 16th and 36th sections in Indian reservations for school purposes; hence this special provision had to be made.[7]

Today only a small percentage of the members of the tribe live on the "closed" part of the reservation. The office of the local Bureau of Indian Affairs is at Sisseton which is not in the "closed" reservation. Federal services to members of the tribe extend to those residing on land opened to settlement as well as to those on trust allotments. The United States supports a tribal government to make and enforce laws throughout the land within the exterior boundaries of the reservation. The attitude of Congress, of the Department of the Interior (under which the Bureau of Indian Affairs functions), and of the tribe is that the jurisdiction of the tribe extends throughout the territory of the reservation as described in the Treaty. A

---

[7] See n. 1, *supra.*

tribal constitution approved August 26, 1966, perpetuates that concept:

> "The jurisdiction of the Sisseton-Wahpeton Sioux Tribe shall extend to lands lying in the territory within the original confines of the Lake Traverse Reservation as described in Article III of the Treaty of February 19, 1867."

The Code of the tribe asserts a jurisdiction over the same domain:

> "The [Sisseton-Wahpeton Sioux Tribal] Court shall have a civil and criminal jurisdiction within the boundaries of the Sisseton-Wahpeton Indian Reservation as defined in the Treaty of February 19, 1867 including trust and non-trust lands, all roads, waters, bridges, and lands used for Federal purposes."

The tribe has a police force and a court. The tribe provides rental housing of 240 units. It provides fire protection. It is the major employer. It operates the only garbage collection and disposal. It is the major governmental entity within the reservation boundaries, servicing Indians[8] and non-Indians.

---

[8] The *DeCoteau* case involves a problem of domestic relations which goes to the heart of tribal self-government. The question of a child's welfare cannot be decided without reference to his family structure. This involves both a sympathetic knowledge of the individuals involved, and a knowledge of the background culture. The tribe is fearful that if South Dakota has jurisdiction over tribal children it will place them with non-Indian families where they will lose their cultural identity. Accordingly the tribe on July 6, 1972, passed the following resolution:

"WHEREAS, The Sisseton-Wahpeton Sioux Tribe is interested in the well-being of all the enrolled members of the tribe and

"WHEREAS, Minor children of Sisseton-Wahpeton descent have been placed in non-Indian foster and adoptive homes all over the United States.

"WHEREAS, The tribal council is in the process of researching

If this were a case where a Mason-Dixon type of line had been drawn separating the land opened for homesteading from that retained by the Indians, it might well be argued that the reservation had been diminished; but that is not the pattern that took place after 1891. Units of land suitable for homesteaders were scattered throughout the reservation. It is indeed difficult, looking at a current map, to find any substantial unit of contiguous Indian land left. The map picture, as stated in oral argument, shows a "crazy quilt pattern." The "crazy quilt" or "checkerboard" jurisdiction defeats the right of tribal self-government guaranteed by Art. X of the 1867 Treaty, 15 Stat. 510, and never abrogated.

In *Seymour* v. *Superintendent,* 368 U. S. 351, 358 (1962), we were invited to make a like construction of "Indian country" as used in 18 U. S. C. § 1151. We rejected that offer saying:

> "[W]here the existence or nonexistence of an Indian reservation, and therefore the existence or nonexistence of federal jurisdiction, depends upon the ownership of particular parcels of land, law enforcement officers operating in the area will find

the sovereign status of the tribal entity in respect to its jurisdiction as stated in the constitution of the Sisseton-Wahpeton Sioux Tribe, and,

"WHEREAS, It is the intent of the Sisseton-Wahpeton Sioux Tribe to establish its own method of social and economic development and well-being of the enrolled members, and,

"WHEREAS, It is the strong feeling of the tribal council to 'make every stand possible to keep these children on the reservation' (minutes of June 6th council meeting) and 'the tribal council would like these children to be placed in an Indian licensed home until an Indian home can be found for them to be adopted.'

"THEREFORE, BE IT RESOLVED, that Mr. Bert Hirsch, legal counsel from the Association of American Indian Affairs, will stand on these grounds in his argument in Roberts County Court on July 7, 1972 and future cases of this nature."

it necessary to search tract books in order to determine whether criminal jurisdiction over each particular offense, even though committed within the reservation, is in the State or Federal Government. Such an impractical pattern of checkerboard jurisdiction was avoided by the plain language of § 1151 and we see no justification for adopting an unwarranted construction of that language where the result would be merely to recreate confusion Congress specifically sought to avoid."

This case involves jurisdiction over Indians—not non-Indians as in *United States* v. *Mazurie,* 419 U. S. 544 (1975)—within the boundaries of the reservation. If South Dakota has its way, the Federal Government and the tribal government have no jurisdiction when an act takes place in a homesteaded spot in the checkerboard; and South Dakota has no say over acts committed on "trust" lands. But where in fact did the jurisdictional act occur? Jurisdiction dependent on the "tract book" promises to be uncertain and hectic. Many acts are ambulatory. In a given case, who will move—the State, the tribe, or the Federal Government? The contest promises to be unseemly, the only beneficiaries being those who benefit from confusion and uncertainty. Without state interference, Indians violating the law within the reservation would be subject only to tribal jurisdiction, which puts the responsibility where the Federal Government can supervise it. Checkerboard jurisdiction cripples the United States in fulfilling its fiduciary responsibilities of guardianship and protection of Indians. It is the end of tribal authority for it introduces such an element of uncertainty as to what agency has jurisdiction as to make modest tribal leaders abdicate and aggressive ones undertake the losing battle against superior state authority. As Mr. Justice Miller stated nearly 100 years ago concerning the

importance of exclusive federal jurisdiction over acts committed by Indians within the boundaries of a reservation: "They owe no allegiance to the States, and receive from them no protection. Because of the local ill feeling, the people of the States where they are found are often their deadliest enemies." *United States* v. *Kagama,* 118 U. S. 375, 384 (1886).