** PART I **
I HAVE RESEARCHED YOUR QUESTIONS CONCERNING HEALTH CARE FACILITIES ON INDIAN LAND. AS I UNDERSTAND IT, YOU WANT TO KNOW WHETHER A HEALTH CARE FACILITY ON INDIAN LAND MUST COMPLY WITH THE STATE LAWS AND REGULATIONS THAT GOVERN SUCH FACILITIES ON NONINDIAN LAND. AS PART OF THIS GENERAL QUESTION, YOU HAVE SPECIFICALLY INQUIRED WHETHER THE FACT THAT A PARTICULAR FACILITY ON INDIAN LAND TREATS NON-INDIAN PERSONS MEANS THAT THE FACILITY MUST COMPLY WITH STATE REGULATIONS. IN ADDITION, YOU HAVE ASKED WHETHER THE FACT THAT A PARTICULAR FACILITY APPLIES FOR AND RECEIVES A CERTIFICATE OF NEED ESTABLISHES THE STATE'S JURISDICTION OVER FUTURE ACTIVITIES OF THE FACILITY. YOU HAVE NOT ASKED FOR AN OFFICIAL OPINION OF THE ATTORNEY GENERAL. THE VIEWS EXPRESSED IN THIS LETTER ARE, THEREFORE, THOSE OF THE UNDERSIGNED ASSISTANT ATTORNEY GENERAL.
YOUR QUESTIONS RAISE ISSUES INVOLVING THE SOVEREIGNTY OF INDIAN TRIBES. IN ORDER TO ANSWER THEM, I WILL FIRST OUTLINE SOME GENERAL SOVEREIGNTY PRINCIPLES. THEN I WILL CONSIDER HOW THESE GENERAL PRINCIPLES APPLY TO YOUR SPECIFIC QUESTIONS.
A. INDIAN SOVEREIGNTY
THE EXTENT OF INDIAN TRIBES' SOVEREIGN POWERS HAS BEEN ANALYZED IN AN EXTENSIVE AND EVOLVING BODY OF CASE LAW BEGINNING WITH THE SUPREME COURT'S DECISION IN WORCESTER V. GEORGIA, 31 U.S. 515 (1832). IN WORCESTER, THE COURT HELD THAT INDIAN NATIONS ARE "DISTINCT POLITICAL COMMUNITIES, HAVING TERRITORIAL BOUNDARIES WITHIN WHICH THEIR AUTHORITY IS EXCLUSIVE, AND HAVING A RIGHT TO ALL THE LANDS WITHIN THOSE BOUNDARIES, WHICH IS NOT ONLY ACKNOWLEDGED, BUT GUARANTEED BY THE UNITED STATES." 31 U.S. AT 557. FROM THE CHARACTERIZATION OF INDIAN TRIBES AS SEPARATE POLITICAL ENTITIES, IT FOLLOWED THAT STATE LAWS WERE GENERALLY INAPPLICABLE TO INDIAN ACTIVITIES WITHIN RESERVATION BOUNDARIES. THE WORCESTER COURT THUS DESCRIBED THE RELATIONSHIP BETWEEN THE LAWS OF GEORGIA AND THE PARTICULAR INDIAN TRIBE INVOLVED IN THE CASE (THE CHEROKEE NATION) AS FOLLOWS:
 "(T)HE ACTS OF GEORGIA ARE REPUGNANT TO THE CONSTITUTION AND LAWS AND TREATIES OF THE UNITED STATES. THEY INTERFERE FORCIBLY WITH THE RELATIONS ESTABLISHED BETWEEN THE UNITED STATES AND THE CHEROKEE NATION, THE REGULATION OF WHICH, ACCORDING TO THE SETTLED PRINCIPLES OF OUR CONSTITUTIONS ARE COMMITTED EXCLUSIVELY TO THE GOVERNMENT OF THE UNION. THEY ARE IN DIRECT HOSTILITY WITH TREATIES, REPEATED IN A SUCCESSION OF YEARS, WHICH MARK OUT THE BOUNDARY THAT SEPARATES THE CHEROKEE COUNTRY FROM GEORGIA, GUARANTY TO THEM ALL THE LAND WITHIN THEIR BOUNDARY, SOLEMNLY PLEDGE THE FAITH OF THE UNITED STATES TO RESTRAIN THEIR CITIZENS FROM TRESPASSING ON IT, AND RECOGNIZE THE PRE-EXISTING POWER OF THE NATION TO GOVERN ITSELF."
31 U.S. AT 561-62.
WORCESTER ESTABLISHED A TERRITORIAL RULE: WITHIN THE BOUNDARIES OF AN INDIAN RESERVATION, TRIBAL AND FEDERAL LAWS, BUT NOT STATE LAWS ARE APPLICABLE; OUTSIDE OF THOSE BOUNDARIES, STATE LAW DOES APPLY. SEE GENERALLY WILKINSON, AMERICAN INDIANS, TIME AND THE LAW, PP. 87-119 (1987). THE WORCESTER, DECISION WAS BASED ON TWO PRINCIPLES: THE LEGISLATIVE AUTHORITY OVER INDIAN MATTERS GRANTED TO CONGRESS BY THE CONSTITUTION; AND (2) THE RETENTION OF TRIBAL SELF-GOVERNMENT WITHIN THE RESERVATION THAT HAD BEEN NEGOTIATED IN THE CHEROKEE TREATIES WITH THE UNITED STATES. SEE COHEN, FEDERAL INDIAN LAW, PP. 259-260 (1982).
DECISIONS FOLLOWING WORCESTER HAVE RELAXED THIS TERRITORIAL RULE SIGNIFICANTLY. IN PARTICULAR, "NOTIONS OF INDIAN SOVEREIGNTY HAVE BEEN ADJUSTED TO TAKE ACCOUNT OF THE STATE'S LEGITIMATE INTERESTS IN REGULATING THE AFFAIRS OF NON-INDIANS." MCCLANAHAN V. ARIZONA STATE TAX COMMISSION,411 U.S. 163, 171 (1973). IN ADDITION, "THE TREND HAS BEEN AWAY FROM THE IDEA OF INHERENT INDIAN SOVEREIGNTY AS A BAR TO STATE JURISDICTION AND TOWARD A RELIANCE ON FEDERAL PRE-EMPTION." ID. AT 171. MODERN CASES THUS "TEND TO AVOID RELIANCE ON PLATONIC NATIONS OF INDIAN SOVEREIGNTY AND LOOK . . . INSTEAD TO THE APPLICABLE TREATIES AND STATUTES WHICH DEFINE THE LIMITS OF STATE POWER." ID. AT 172.
UNDER THE MODERN APPROACH, THE SUPREME COURT HAS IDENTIFIED "TWO INDEPENDENT BUT RELATED BARRIERS TO THE ASSERTION OF STATE REGULATORY AUTHORITY OVER TRIBAL RESERVATIONS AND MEMBERS." WHITE MOUNTAIN APACHE TRIBE V. BRACKER,448 U.S. 136, 142-43 (1980). FIRST, THE EXERCISE OF SUCH STATE AUTHORITY MAY BE PREEMPTED BY FEDERAL LAW. SECOND, STATE REGULATION MAY UNLAWFULLY INFRINGE "ON THE RIGHT OF RESERVATION INDIANS TO MAKE THEIR OWN LAWS AND BE RULED BY THEM." WHITE MOUNTAIN, 448 U.S. AT 142, QUOTING WILLIAMS V. LEE, 358 U.S. 217, 220 (1959). UNDER THIS TWO-PRONGED TEST, "TRADITIONAL NOTIONS OF INDIAN SELF-GOVERNMENT ARE SO DEEPLY ENGRAINED IN OUR JURISPRUDENCE THAT THEY HAVE PROVIDED AN IMPORTANT BACKDROP AGAINST WHICH VAGUE OR AMBIGUOUS FEDERAL ENACTMENTS MUST ALWAYS BE MEASURED." AS A RESULT, UNDER THE MODERN CASES, INDIAN TRIBES HAVE RETAINED "A SEMI-INDEPENDENT POSITION . . . NOT AS STATES, NOT AS NATIONS, NOT AS POSSESSED OF THE FULL ATTRIBUTES OF SOVEREIGNTY, BUT AS A SEPARATE PEOPLE, WITH THE POWER OF REGULATING THEIR INTERNAL AND SOCIAL RELATIONS, AND THUS FAR NOT BROUGHT UNDER THE LAWS OF THE UNION . . . OR THE STATES WITHIN WHOSE LIMITS THEY RESIDED." MCCLANAHAN, 411 U.S. AT 173, QUOTING STATES V. KAGAMA, 118 U.S. 375, 381-82 (1886).
ANOTHER SIGNIFICANT DEVELOPMENT IN THE LAW OF INDIAN SOVEREIGNTY INVOLVES THE IDENTIFICATION OF THE TERRITORY OVER WHICH THESE JURISDICTIONAL PRINCIPLES ARE APPLIED. ALTHOUGH WORCESTER AND SUBSEQUENT CASES REFER TO RESERVATIONS AS THE AREAS OVER WHICH TRIBES ARE ENTITLED TO GOVERN THEMSELVES WITHOUT STATE INTERFERENCE, IT IS "INDIAN COUNTRY" THAT IS NOW THE TOUCHSTONE IN DETERMINING WHETHER INDIAN SOVEREIGNTY PRINCIPLES SHOULD BE APPLIED TO A PARTICULAR AREA. "INDIAN COUNTRY" IS DEFINED IN18 U.S.C. 1151, AS:
 "(A) ALL LAND WITHIN THE LIMITS OF ANY INDIAN RESERVATION UNDER THE JURISDICTION OF THE UNITED STATES GOVERNMENT, NOTWITHSTANDING THE ISSUANCE OF ANY PATENT, AND, INCLUDING RIGHT OF WAY RUNNING THROUGH THE RESERVATION, (B) ALL DEPENDENT INDIAN COMMUNITIES WITHIN THE BORDERS OF THE UNITED STATES WHETHER WITHIN THE ORIGINAL OR SUBSEQUENTLY ACQUIRED TERRITORY THEREOF, AND WHETHER WITHIN OR WITHOUT THE LIMITS OF A STATE, AND (C) ALL INDIAN ALLOTMENTS, THE INDIAN TITLES TO WHICH HAVE NOT BEEN EXTINGUISHED, INCLUDING RIGHT OF WAY RUNNING THROUGH THE SAME."
ALTHOUGH SECTION 18 U.S.C.A. 1151 WAS ENACTED AS PART OF THE FEDERAL CRIMINAL CODE, THE DEFINITION OF INDIAN COUNTRY THAT IT SETS FORTH IS APPLICABLE TO QUESTIONS OF CIVIL JURISDICTION AND TO THE IDENTIFICATION OF AREAS OVER WHICH STATE REGULATORY AUTHORITY MAY NOT GENERALLY INTRUDE. DECOTEAU V. DISTRICT COUNTY COURT, 420 U.S. 425, 427 N. 2 (1975); CITIZEN BAND POTTAWATOMI INDIAN TRIBES OF OKLAHOMA V. OKLAHOMA TAX COMMISSION, 88-2160, 88-2172, SLIP. OP. AT 7-10 (10TH CIR. 1989); CHEYENNE-ARAPAHO TRIBES V. OKLAHOMA, 618 F.2D 665 (10TH CIR. 1980).
MODERN PRINCIPLES OF INDIAN SOVEREIGNTY, ALONG WITH SECTION 1151'S DEFINITION OF INDIAN COUNTRY HAVE LED TO A PER SE RULE REGARDING STATE TAXATION AND REGULATION OF INDIAN ACTIVITIES WITHIN INDIAN COUNTRY AND OF POSSESSIONS OF TRIBES AND TRIBAL MEMBERS. ABSENT CONGRESSIONAL AUTHORIZATION, STATES MAY NOT TAX OR REGULATE INDIAN ACTIVITIES WITHIN INDIAN COUNTRY. WHITE MOUNTAIN, 448 U.S. AT 144. F. COHEN, FEDERAL INDIAN LAW, PP. 405-07. IN SUCH INSTANCES, "THE STATES' REGULATORY INTEREST IS LIKELY TO BE MINIMAL AND THE FEDERAL INTEREST IN ENCOURAGING TRIBAL SELF-GOVERNMENT IS AT IT STRONGEST." WHITE MOUNTAIN, 448 U.S. AT 144. IN CONTRAST, "ABSENT AN EXPRESS FEDERAL LAW TO THE CONTRARY, INDIANS GOING BEYOND RESERVATION BOUNDARIES HAVE GENERALLY BEEN HELD SUBJECT TO NONDISCRIMINATORY STATE LAW OTHERWISE APPLICABLE TO ALL CITIZENS OF THE STATE." MESCALERO APACHE TRIBE V. JONES, 411 U.S. 145, 14849 (1973). SEE ALSO F. COHEN, FEDERAL INDIAN LAW, PP. 416-418 (1982).
NON-INDIAN ACTIVITIES WITHIN INDIAN COUNTRY RAISE MORE DIFFICULT QUESTIONS. WHEN SUCH ACTIVITIES ARE INVOLVED, ONE MUST EXAMINE "THE LANGUAGE OF THE RELEVANT FEDERAL TREATIES AND STATUTES IN TERMS OF BOTH THE BROAD POLICIES THAT UNDERLIE THEM AND THE NOTIONS OF SOVEREIGNTY THAT HAVE DEVELOPED FROM HISTORICAL TRADITIONS OF TRIBAL INDEPENDENCE." WHITE MOUNTAIN, 448 U.S. AT 144-145. THE SUPREME COURT HAS STATED, "THIS INQUIRY AS TO THE STATES' JURISDICTION OVER NON-INDIAN ACTIVITIES ON INDIAN LAND IS NOT D EPENDENT ON MECHANICAL OR ABSOLUTE CONCEPTIONS OF STATE OR TRIBAL SOVEREIGNTY, BUT HAS CALLED FOR AN EXTENSIVE INQUIRY INTO THE NATURE OF THE STATE, FEDERAL, AND TRIBAL INTERESTS AT STAKE, AN INQUIRY DESIGNED TO DETERMINE WHETHER, IN THE SPECIFIC CONTEXT, THE EXERCISE OF STATE AUTHORITY WOULD VIOLATE FEDERAL LAW." WHITE MOUNTAIN, 448 U.S. AT 145. IN A NUMBER OF CIRCUMSTANCES, COURTS HAVE APPLIED THIS ANALYSIS TO ALLOW STATE REGULATION AND TAXATION OF NON-INDIAN ACTIVITIES WITHIN INDIAN COUNTRY. SEE E.G., WASHINGTON V. CONFEDERATE TRIBES OF THE COLVILLE INDIAN RESERVATION, 447 U.S. 134 (1980) (ALLOWING TAXATION OF CIGARETTES SOLD TO NON-INDIANS ON INDIAN COUNTRY); CHEMEHUEVI INDIAN TRIBE V. CALIFORNIA STATE BOARD OF EQUALIZATION, 800 F.2D 1446 (9TH CIR. 1986) (ALLOWING SIMILAR TAXATION OF CIGARETTES); COTTON PETROLEUM CORP. OF NEW MEXICO, 104 L.ED 2D 209 (1989) (UPHOLDING STATE SEVERANCE TAX ASSESSED AGAINST NON-INDIAN LESSEE OPERATING ON INDIAN LAND). THESE COURTS HAVE CONCLUDED THAT THESE PARTICULAR ASSERTIONS OF STATE JURISDICTION HAVE NOT BEEN PREEMPTED BY FEDERAL LAW AND HAVE NOT INFRINGED UPON THE INDIANS' RIGHTS TO GOVERN THEMSELVES.