770 F.2d 730
 OGLALA SIOUX TRIBE OF the PINE RIDGE INDIAN RESERVATION, Appellant,
v.
The STATE OF SOUTH DAKOTA; Richard Kneip, in his official
capacity as Governor of the State of South Dakota; County
of Jackson, a political subdivision of the State of South
Dakota; Joyce Hicks, in her official capacity as Auditor of
the County of Jackson; Steve Jeffords, Terry Oien; Keith
Crew, in their official capacities as the County
Commissioners for the County of Jackson, Appellees.
Cheyenne River Sioux Tribe, Amicus/Appellant.
 No. 84-1997.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 12, 1985.
Decided Aug. 15, 1985.
 
 Mario Gonzalez, Pine Ridge, S.D., for appellant.
 Dennis Holmes, Pierre, S.D., for State of S.D.
 Robert A. Sambroak, Jr., Kadoka, S.D., for Jackson County.
 Before ROSS and BOWMAN, Circuit Judges, and OLIVER,* District Judge.
 ROSS, Circuit Judge.
 
 
 1
 The Oglala Sioux Tribe filed this suit seeking to set aside the consolidation of two South Dakota counties--Jackson and Washabaugh. Prior to the consolidation, Washabaugh County laid entirely within the Pine Ridge Indian Reservation of the Oglala Sioux Tribe and had been an unorganized county attached to Jackson County for governmental purposes. Washabaugh County was eliminated by the consolidation and the Jackson County boundaries were expanded to include the boundaries of Washabaugh County.
 
 
 2
 After a bench trial, the district court refused to grant the Tribe's requested injunctive and declarative relief and dismissed the case. The Tribe now appeals, arguing that the consolidation was unlawful because the mere existence of a state governmental entity on the reservation with general governmental powers, such as Jackson County, is preempted by federal law and impermissibly infringes upon the Tribe's right of self-government. We disagree with this broad contention. Accordingly, we affirm the district court's dismissal of this case.
 
 FACTS
 
 3
 This suit arises from the abolition of South Dakota's unusual governmental scheme involving the division of counties into "organized" and "unorganized" counties. We have previously described this governmental scheme as follows:
 
 
 4
 The State of South Dakota is divided, by S.D.C.L. Secs. 7-1-2 through 7-1-68 (1967), into sixty-seven county units. For purposes of county administration and government, these sixty-seven counties are divided into organized and unorganized counties. S.D.C.L. Sec. 7-4-1 (1967) recognized the validity of every county government operating as such on the date of South Dakota's admission as a state. These became the first organized counties. Presumably all other counties were at that time designated as unorganized counties. A statutory method of organizing a county government, through petition and referendum, was also established and at the present time the only unorganized counties are * * * Todd, Washabaugh and Shannon.
 
 
 5
 Each organized county has a full complement of elected county officials whose task it is to administer the affairs of local government. They include county commissioners, judges, clerk of court, register of deeds, auditor, treasurer, sheriff, coroner and attorney. The unorganized counties, however, do not elect these officials for themselves but rather are attached to an adjoining county for purposes of government and administration. The officials of the organized counties, under the provisions of S.D.C.L. Secs. 7-17-3 (1967) and 7-17-5 (1974), administer the affairs of the attached unorganized counties and have all the powers and duties with regard to the attached county that they have in their own.
 
 
 6
 United States v. South Dakota, 636 F.2d 241, 242-43 (8th Cir.1980), cert. denied, 452 U.S. 939, 101 S.Ct. 3082, 69 L.Ed.2d 953 (1981) (quoting Little Thunder v. South Dakota, 518 F.2d 1253, 1254 (8th Cir.1975)).
 
 
 7
 In our first encounter with South Dakota's county government scheme, we held that residents of unorganized counties could not be denied the right to vote in county elections of the attaching organized county. Little Thunder v. South Dakota, supra. We stated:
 
 
 8
 In the instant case residents of the unorganized counties possess a substantial interest in the choice of county officials since those officials govern their affairs.
 
 
 9
 * * *
 
 
 10
 * * *
 
 
 11
 Under the provisions of S.D.C.L. Secs. 7-17-3 (1967) and 7-17-5 (1974) these officials exercise the same authority and are impressed with the same obligations towards the unorganized counties as towards their own organized county. The fact that plaintiffs are reservation Indians is not of great significance. While it is true that Todd, Washabaugh and Shannon counties lie totally within Indian reservations and that the state has limited jurisdiction over them, the effects of county government are not completely absent. Both Indians and non-Indians for example pay taxes on deeded land, whether within or without the reservation, and the tax rate is fixed by the county commissioners. S.D.C.L. Sec. 10-12-10 (1967). The county sheriff is obligated to appoint a deputy sheriff to keep the peace in the unorganized counties. S.D.C.L. Sec. 7-17-6 (1967). Indians and non-Indians living within the reservation record deeds and file documents just the same as their fellow citizens. We think it clear that officials of the organized county exercise substantial power over the affairs of individuals living in the unorganized counties.
 
 
 12
 Little Thunder v. South Dakota, supra, 518 F.2d at 1256-58. In a subsequent case, we held that residents of unorganized counties could not be denied the right to run for office in the organized county to which their county was attached. United States v. South Dakota, supra.
 
 
 13
 Shortly after our decision in Little Thunder,[1] residents of Washabaugh County circulated petitions seeking to submit the issue of consolidating Washabaugh and Jackson Counties to the voters. See S.D. CODIFIED LAWS ANN. Sec. 7-2-1 (1981 Rev.). The petition effort was successful and, in the November 1976 general election, the consolidation was approved by a majority of votes cast on the issue in both counties. See S.D. CODIFIED LAWS ANN. Sec. 7-2-3 (1981 Rev.). The consolidation became effective on January 1, 1979.[2] See S.D. CODIFIED LAWS ANN. Secs. 7-2-4, -5 (1981 Rev.).
 
 
 14
 Prior to the consolidation, Jackson County provided only the most fundamental services, such as the recordation of deeds and birth and death certificates, police protection, road maintenance, education, a judicial system, and the distribution of food stamps and veterans benefits. A comprehensive system of regulations and ordinances had not been implemented. The only change in county government since the consolidation which has come to our attention is the transfer of the responsibilities of the Washabaugh County Road Board to the Board of Commissioners of Jackson County. The district court relied upon this lack of change in government as support for its conclusion that no infringement on the tribal right of self-government had been established, stating:
 
 
 15
 Even though Washabaugh County was unorganized, it still received governmental services through Jackson County, such as election procedures, land and vehicle title registration, roads, law enforcement involving non-Indians, and general county administrative activity. No serious claim is made or supported by any evidence that the governmental activities while Washabaugh County was unorganized infringed on plaintiff's rights to self-government. The consolidation did not increase the scope of state governmental activity in the Washabaugh County area, and therefore, it did not infringe on the plaintiff's rights.
 
 
 16
 No claim is made by the defendants, nor could any be made, that state jurisdiction over the Washabaugh County area is enlarged or extended in any manner by the consolidation. State jurisdiction remains now the same as before the consolidation.
 
 
 17
 Oglala Sioux Tribe of the Pine Ridge Indian Reservation v. South Dakota, Civ. 77-5020 (D.S.D. Dec. 27, 1983) (memorandum opinion).
 
 DISCUSSION
 
 18
 The basic principles for a case of this type were laid out in Rice v. Rehner, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983), as follows:
 
 
 19
 The decisions of this Court concerning the principles to be applied in determining whether state regulation of activities in Indian country is preempted have not been static. In Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 561, 8 L.Ed. 483 (1832), Chief Justice Marshall wrote that an Indian reservation "is a distinct community, occupying its own territory, with boundaries accurately described, in which ... [state laws] can have no force ...." Despite this early statement emphasizing the importance of tribal self-government, "Congress has to a substantial degree opened the doors of reservations to state laws, in marked contrast to what prevailed in the time of Chief Justice Marshall," Organized Village of Kake v. Egan, 369 U.S. 60, 74, 82 S.Ct. 562, 570, 7 L.Ed.2d 573 (1962). "[E]ven on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law." Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973) * * *.
 
 
 20
 Id. at 718, 103 S.Ct. at 3294 (emphasis added). On appeal, the Oglala Sioux Tribe relies primarily on the concept of federal preemption to attack the consolidation at issue, since
 
 
 21
 [a]lthough "[f]ederal treaties and statutes have been consistently construed to reserve the right of self -government to the tribes," Cohen's Handbook of Federal Indian Law 273 (1982) * * * [, the Supreme Court's] recent cases have established a "trend ... away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption." McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973) (footnote omitted).
 
 
 22
 Id. at 718, 103 S.Ct. at 3295.
 
 
 23
 Under a federal preemption analysis, we must "look * * * to the applicable treaties and statutes which define the limits of state power." McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973). The doctrine of Indian sovereignty is relevant, however, as a "backdrop against which the applicable treaties and federal statutes must be read." Id. If "we do not find * * * a tradition [of immunity or self-government], or if we determine that the balance of state, federal, and tribal interests so requires, our pre-emption analysis may accord less weight to the 'backdrop' of tribal sovereignty." Rice v. Rehner, supra, 463 U.S. at 720, 103 S.Ct. at 3295.
 
 
 24
 In this case, the Tribe challenges the existence of a general purpose state governmental body on the reservation, rather than the exercise of specific state governmental jurisdiction on the reservation relating to a particular area such as taxation.[3] Thus, the tribal sovereignty interest which the Tribe seeks to protect here involves the broad right to be the exclusive governmental body on the reservation.
 
 
 25
 The Supreme Court has made it clear that state government is no longer entirely barred from the reservations. See Rice v. Rehner, supra, 463 U.S. at 716, 103 S.Ct. at 3294; McClanahan v. Arizona State Tax Commission, supra, 411 U.S. at 171, 93 S.Ct. at 1261 ("notions of Indian sovereignty have been adjusted to take account of the State's legitimate interests in regulating the affairs of non-Indians."). Yet, by challenging the mere existence of a general purpose state governmental body on the reservation, the Tribe is seeking, in effect, to entirely oust the State of jurisdiction on the reservation. We do not perceive either tradition or the balance of state, federal, or tribal interests as supporting the broad generalization that states have no jurisdiction at all on reservations. Thus, the "backdrop" of tribal sovereignty involved in this case may be accorded less weight when we analyze the treaties and federal statutes involved in this case. Rice v. Rehner, supra, 463 U.S. at 718, 103 S.Ct. at 3295.
 
 
 26
 The Tribe has alleged that the consolidation at issue here is preempted by either the Treaty of Fort Laramie, Apr. 29, 1868, 15 Stat. 635, or by the Enabling Act of Feb. 22, 1889, 25 Stat. 676.[4] Specifically, the Tribe emphasizes that the Treaty of Fort Laramie established the Great Reservation of the Sioux Nation "for the absolute and undisturbed use and occupation" of the Sioux Nation, including the Oglala Sioux Tribe, and provided that "no persons except those herein designated and authorized so to do * * * shall ever be permitted to pass over, settle upon, or reside in the territory" encompassed within the reservation. Treaty of Fort Laramie, Apr. 29, 1868, Art. II, 15 Stat. 635, 636. In regards to the Enabling Act, the Tribe emphasizes that the Act required South Dakota to "disclaim all right and title * * * to all lands lying within * * * [South Dakota] owned or held by any Indian or Indian tribes" in order to obtain statehood, Enabling Act of Feb. 22, 1889, Sec. 4, cl. 2, 25 Stat. 676, 677, and that, in fact, the required disclaimer was made by South Dakota. See S.D. Const. Art. XXII, cl. 2.
 
 
 27
 The Tribe's reliance on the Enabling Act for the proposition that the Pine Ridge Indian Reservation is entirely beyond state jurisdiction is misplaced since "the presence or absence of specific jurisdictional disclaimers [in statehood enabling acts] has rarely been dispositive in * * * [the Supreme Court's] consideration of state jurisdiction over Indian affairs or activities on Indian lands." Arizona v. San Carlos Apache Tribe of Arizona, 463 U.S. 545, 561, 103 S.Ct. 3201, 3211, 77 L.Ed.2d 837 (1983). The reason for the insignificant nature of such disclaimers in preemption cases is that "disclaimer[s] of right and title by the State[s] * * * [are] disclaimer[s] of proprietary rather than governmental interest" and the "absolute" jurisdiction and control over reservations typically given to the United States by such disclaimers means "undiminished, not exclusive" control. Kake Village v. Egan, 369 U.S. 60, 69, 71, 82 S.Ct. 562, 567, 568, 7 L.Ed.2d 573 (1962).
 
 
 28
 We are also not persuaded by the Tribe's reliance on the Treaty of Fort Laramie for the proposition that the consolidation at issue here is preempted by federal law. The Tribe's argument boils down to the proposition that the State can have no jurisdiction in the reservation because the Tribe is the exclusive owner of all land on the reservation and because all non-Indians who are on the reservation are there in violation of the Treaty of Fort Laramie. We reject this proposition and accordingly, reject the Tribe's preemption argument.[5] First, the question of who owns the land on the reservation is clearly irrelevant to the inquiry at hand. Second, non-Indians are on the reservation and the illegality of their presence on the reservation cannot serve to entirely oust the State of jurisdiction on the reservation.
 
 
 29
 The Tribe also argues that the consolidation at issue here impermissibly infringes upon their right of self-government. See Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1950) ("absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them"). The Tribe suggests three ways in which the consolidation of the counties might affect tribal self-government: 1) the consolidated county may compete with the Tribe for federal funding,[6] 2) the consolidated county will have authority under state statutes to perform various public acts which are within the Tribe's jurisdiction, and 3) tribal self-government may be harmed by a dual system in which the Tribe would be governed by tribal law and non-Indians would be governed by state and county law.
 
 
 30
 The key word in the Tribe's argument is "might". The Tribe has failed to establish that any of the potential threats to their right of tribal self-government which are arguably engendered by the consolidation have actually infringed upon their right of self-government. Thus, we find that the consolidation of Washabaugh and Jackson Counties has not impermissibly infringed upon the Tribe's right of self-government.
 
 CONCLUSION
 
 31
 We find that the mere existence of a general purpose state governmental body on the reservation is not preempted by federal law and does not impermissibly infringe upon tribal self-government. Accordingly, we affirm the district court's dismissal of this case.
 
 
 32
 We add that, in the final analysis, this case involved an action in which only exceedingly broad and vague claims of potential conflict with tribal sovereignty and federal treaties and statutes were asserted. Cf. Cass County v. United States, 570 F.2d 737 (8th Cir.1978) (declaratory action seeking general declaration as to governmental rights between state and tribe on a reservation dismissed for lack of justiciable controversy due to lack of specificity of conflict). The mere consolidation of Jackson and Washabaugh Counties has caused no injury to the Tribe and accordingly, we give no relief to the Tribe. We emphasize, however, that our decision in this case does not foreclose the Tribe from seeking relief from specific action by the consolidated Jackson County which may unlawfully interfere with the Tribe's rights.
 
 
 
 *
 The HONORABLE JOHN W. OLIVER, Senior United States District Judge for the Western District of Missouri, sitting by designation
 
 
 [1]
 In fact, the district court concluded that the Little Thunder decision "was a catalyst in commencing the consolidation procedures" involved in this case. Oglala Sioux Tribe of the Pine Ridge Indian Reservation v. South Dakota, Civ. 77-5020 (D.S.D. Dec. 27, 1983) (memorandum opinion)
 
 
 [2]
 The abolition of counties with unorganized status in South Dakota was completed when the two other unorganized counties, Todd and Shannon, were organized and established as governmental bodies independent of other counties by a bill passed by the South Dakota legislature in 1979 (H.B. 1197, 54 Sess.) which repealed the provisions of the South Dakota statutes relating to organized and unorganized counties. See United States v. South Dakota, 636 F.2d 241, 245 n. 6 (8th Cir.1980), cert. denied, 452 U.S. 939, 101 S.Ct. 3082, 69 L.Ed.2d 953 (1981). A consent decree approving the organization of Todd and Shannon Counties was subsequently entered into. See South Dakota v. United States, No. 80-1976 (D.D.C. Nov. 1981)
 
 
 [3]
 The Tribe admits that this case is "unique from most other pre-emption cases dealing with state encroachment on Indian reservations" due to this broad challenge to state jurisdiction. Brief for Appellant Oglala Sioux Tribe at 2-3
 
 
 [4]
 The Tribe has also cited the Dakota Territory Organic Act, Mar. 2, 1861, 12 Stat. 239, the Indian Reorganization Act of 1934, 25 U.S.C. Secs. 461-479 (1982), South Dakota's refusal to accept jurisdiction over Indian country by adopting Public Law 280, Act of Aug. 15, 1953, 67 Stat. 588 (codified in part as 18 U.S.C. Sec. 1162 (1982) and 28 U.S.C. Sec. 1360 (1982)), see White v. Califano, 437 F.Supp. 543, 561-63 (D.S.D.1977), aff'd, 581 F.2d 697 (8th Cir.1978) (history of South Dakota's refusal to assume jurisdiction via Public Law 280 discussed), and other various treaties and statutes as supporting the doctrine of tribal self-government. We find no need to separately discuss each of these treaties and statutes
 
 
 [5]
 The State has argued that the pertinent provisions of the Treaty of Fort Laramie relied upon by the Tribe were repealed or modified by an allotment act passed in 1889. Act of Mar. 2, 1889, 25 Stat. 888. This Act permitted the various bands of the Sioux Nation to divide the Great Reservation of the Sioux Nation into separate reservations, such as the Pine Ridge Indian Reservation, section 1, 25 Stat. at 888, and authorized the allotment of such subdivisions amongst the Indians. Section 8, 25 Stat. at 890
 The Oglala Sioux Tribe argues that this Act did not affect the Treaty of Fort Laramie because the Act was never accepted and consented to by the Oglalas as required by the Act. Section 28, 25 Stat. at 899. The State responds that the Act was accepted and consented to by the Oglalas, and that, in fact, a presidential proclamation had been issued declaring that the Act had become effective. Proclamation No. 9, Feb. 10, 1890, 26 Stat. 1554.
 Due to our conclusion that the consolidation at issue is not preempted even if the Treaty of Fort Laramie was not modified by the 1889 Allotment Act, we need not determine whether the 1889 Allotment Act was accepted and consented to by the Oglalas as required by that Act. See Oglala Sioux Tribe of the Pine Ridge Indian Reservation v. South Dakota, Civ. 77-5020 (D.S.D. December 27, 1983) (memorandum opinion) ("it is unnecessary to consider or determine the issue of whether the federal government acted properly in allotting land within the Pine Ridge Indian Reservation").
 
 
 [6]
 The district court specifically rejected this contention, stating: "Neither the evidence herein nor the offer of proof * * * suggests that the consolidation of these counties affects the problem of competition over federal funding in any manner." Oglala Sioux Tribe of the Pine Ridge Indian Reservation v. South Dakota, Civ. 77-5020 (D.S.D. Dec. 27, 1983) (memorandum opinion)