#29066, #29074, #29082-a-JMK
**2020 S.D. 72**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

PICKEREL LAKE OUTLET
ASSOCIATION, a South Dakota non-
profit corporation, GARY WALD, KELSEY
BECKSTROM, GREG BURGESS, NANCY
BURGESS, LAUREN JOHNSON, KATHLEEN
JOHNSON, GREG JOHNSON, MARY JOHNSON,
BRUCE MAY, RHONDA MAY, MARK THOMPSON,
JUNE THOMPSON, JUSTIN HANSON, MATT
PAULSON, JOSH LARSON, SCOTT KRAM,
KIM KRAM, THOMAS MEYER, DALITA MEYER,
MICAH LIKNESS, JOHN WOODMAN, RAMONA
WOODMAN, ROGER RIX, PAM RIX, CLARK
LIKNESS, GERRY LIKNESS, GREG PETERSON,
EMERY SIPPEL, MARC SIPPEL, LYNN PETERSON,
SCOTT VOGEL, ROBERT BISGARD, AL VANDERLAAN,
JASON SNELL, RON BELDEN, BENJAMIN JOHNSON,
NICOLE JOHNSON, PAUL TVINNEREIM,
KRIS TVINNEREIM, DAWN FRIEDRICHSEN,    Plaintiffs and Appellants,

        v.

DAY COUNTY, SOUTH DAKOTA, a
South Dakota Public Corporation and
THE STATE OF SOUTH DAKOTA,            Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
DAY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JON S. FLEMMER
Judge

* * * *

ARGUED
FEBRUARY 12, 2020
OPINION FILED **12/22/20**

JACK H. HIEB
ZACHARY W. PETERSON of
Richardson, Wyly, Wise,
    Sauck & Hieb, LLP
Aberdeen, South Dakota

Attorneys for plaintiffs
and appellants.


JASON R. RAVNSBORG
Attorney General

STACY R. HEGGE
Assistant Attorney General
Pierre, South Dakota

Attorneys for defendant
and appellee, State of South
Dakota.


DANNY R. SMEINS
Day County State's Attorney
Webster, South Dakota

Attorneys for defendant and
appellee, Day County.

#29066, #29074, #29082

KERN, Justice

[¶1.]     The Pickerel Lake Outlet Association, a South Dakota domestic non-profit corporation, and forty non-Indian owners of permanent improvements around Pickerel Lake (the Plaintiffs) filed a declaratory judgment action in circuit court challenging ad valorem property taxes that Day County assessed against them. They claimed that federal law preempted taxation because their structures are on land held in trust for the Sisseton–Wahpeton Oyate. The State defended the taxes and challenged the Plaintiffs' standing to sue. The circuit court concluded the Plaintiffs had standing and upheld the disputed taxes. The Plaintiffs appeal. We affirm.

## Facts and Procedural History

[¶2.]     Pickerel Lake, a spring-fed lake located in Day County, South Dakota,[1] is a popular destination for various outdoor recreational activities. Many private cabins surround its shores, some of which are located on land the United States holds in trust for the Sisseton–Wahpeton Oyate (the Tribe) or its members.[2] The

---

1.    Day County is a political subdivision of the State of South Dakota. *See Edgemont Sch. Dist. 23-1 v. South Dakota Dep't of Rev.*, 1999 S.D. 48, ¶ 14, 593 N.W.2d 36, 40.

2.    The Tribe is federally recognized and operates a fully functioning tribal government within the boundaries of the former Lake Traverse Indian Reservation, which included Pickerel Lake and the area surrounding it. *South Dakota v. United States Dep't of Interior*, 665 F.3d 986, 987 (8th Cir. 2012). In 1975, the United States Supreme Court held (in a split decision) that the Lake Traverse Reservation was disestablished when Congress passed an act approving a surplus land agreement between the Tribe and the federal government in 1891. *DeCoteau v. Dist. Cty. Ct. for Tenth Jud. Dist.*, 420 U.S. 425, 427–28, 432, 95 S. Ct. 1082, 1084–85, 1087, 43 L. Ed. 2d 300 (1975). Nevertheless, the trust land situated within the boundaries of the
                                                              (continued . . .)

-1-

individually named plaintiffs, none of whom are tribal members, belong to the Pickerel Lake Outlet Association (the Association). The Association leases 31.28 acres of the trust land surrounding Pickerel Lake from the Bureau of Indian Affairs (BIA) for the benefit of Association members. The land is identified as Allotment #1199 Henry Campbell.[3] The Association's bylaws provide that the membership includes "a sub-leased lot of approximately fifty [feet] (50') of lake frontage[,]" but there is no evidence in the record that the members hold individual leases. The members do, however, own a variety of structures on the west side of Pickerel Lake, including cabins, sheds, cottages, garages, and other structures.

[¶3.] The Tribe collects ad valorem property taxes from the Plaintiffs for their structures.[4] Day County (the County) also assesses taxes against the Plaintiffs for the same cabins.[5] The County's tax revenue is paid to the Webster

_____

(. . . continued)

former reservation remains "Indian country" as that term is defined and construed under federal law. *See Oklahoma Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 123, 113 S. Ct. 1985, 1991, 124 L. Ed. 2d 30 (1985) ("Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States.") (citing 18 U.S.C. § 1151).

3. A more detailed description of the parcel is: "Kosciusko Township–Day County, SD–Fifth Principal Meridian, Allot. #1199–Lot 8, Sec. 22, T. 124 N.R. 53 W."

4. Ad valorem tax is a tax based on the value of a transaction or property. The tax is imposed pursuant to § 67-06-02 of the Sisseton–Wahpeton Oyate tax code.

5. The County assessed tax on the structures in accordance with SDCL 10-4-1, SDCL 10-4-2, and SDCL 10-4-2.1. SDCL 10-4-1 provides that "[a]ll real property[,] . . . except such as is hereinafter expressly excepted, is subject to taxation[.]" SDCL 10-4-2 provides definitions for the types of property

(continued . . .)

Area School District #18-5, the Koskuisko Township, the County, and the Pickerel Lake Sanitary District, and is used to fund various public services. For example, the taxes levied for the Koskuisko Township pay for fire and road maintenance services. The County also uses its portion of the tax revenues to fund the County administration, law enforcement, highways, planning and zoning, and emergency services. Taxes for the Pickerel Lake Sanitary District provide sewer services to the Plaintiffs' cabins.

[¶4.] The Plaintiffs objected to the assessment of the County's property taxes. Some have refused to pay them since 2013, while others have paid under protest pursuant to SDCL 10-27-2. On December 14, 2014, they commenced this action against the County to formally challenge its taxing authority. After over two years of litigation, the parties moved for summary judgment. The Plaintiffs centered their motion on preemption, theorizing that federal law expressly or implicitly forecloses the County from taxing permanent improvements on trust land without regard to ownership. They based their statutory express preemption argument solely on 25 U.S.C. § 5108 (formerly 25 U.S.C. § 465), a provision contained within the Indian Reorganization Act of 1934 (the IRA) that exempts land acquired pursuant to its provisions "from State and local taxation." Additionally,

---

(. . . continued)
    subject to ad valorem taxation and includes improvements to land as within the scope of taxation. SDCL 10-4-2(2). SDCL 10-4-2.1 provides that improvements that sit on leased land may be taxed as real property.

the Plaintiffs pointed to 25 C.F.R. § 162.017(a) (a regulation promulgated by the BIA) to support their claim of express preemption or field preemption.[6]

[¶5.]     The State defended the County's authority to levy the taxes, arguing preemption did not apply because neither the Tribe, nor any tribal member owns any of the cabins subject to the County's tax.  In so arguing, the State questioned the applicability of the federal statute, the BIA regulations, and the United States Supreme Court precedent on which the Plaintiffs relied.  It also challenged the Plaintiffs' standing to sue, arguing their claim failed the "zone of interests" test.

[¶6.]     The circuit court concluded the Plaintiffs had standing to sue and upheld the County's authority to assess the taxes.  The Plaintiffs appeal, arguing the circuit court's decision to uphold the tax was erroneous.  The State, by notice of review, challenges the Plaintiffs' standing to bring this suit.

**Analysis and Decision**

### 1.     *Whether the Plaintiffs have standing to sue.*

[¶7.]     "Although standing is distinct from subject-matter jurisdiction, a circuit court may not exercise its subject-matter jurisdiction unless the parties have standing." *Lippold v. Meade Cty. Bd. of Comm'rs*, 2018 S.D. 7, ¶ 18, 906 N.W.2d 917, 922.  In consideration of this principle, we first address the question of standing raised by the State on notice of review.  "Whether a party has standing to

---

6.     This regulation provides, "Subject only to applicable Federal law, permanent improvements on the leased land, without regard to ownership of those improvements, are not subject to any fee, tax, assessment, levy, or other charge imposed by any State or political subdivision of a State." *Id.*

maintain an action is a question of law reviewable by this Court de novo." *Howlett v. Stellingwerf*, 2018 S.D. 19, ¶ 11, 908 N.W.2d 775, 779.

[¶8.] The State's challenge to the Plaintiffs' standing to contest the County's taxation of their property rests entirely on the State's argument that the Plaintiffs do not fit within the "zone of interest" of § 5108 of the IRA. Congress passed the IRA "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152, 93 S. Ct. 1267, 1272, 36 L. Ed. 2d 114 (1973) (quoting H.R. Rep. No. 1804, 73d Cong., 2d Sess., 6 (1934)). The IRA "reflected a new policy of the Federal Government and aimed to put a halt to the loss of tribal lands through allotment." *Id.* at 151, 93 S. Ct. at 1272; *see also Nichols v. Rysavy*, 809 F.2d 1317, 1323 (8th Cir. 1987) (observing that the provisions of the IRA were meant "to stabilize the tribal land base"). It authorized the United States to acquire lands "within or without existing reservations . . . for the purpose of providing land for Indians." 25 U.S.C. § 5108.

[¶9.] In the State's view, the language and purpose of § 5108 is to shield Indians (rather than non-Indians) from taxation. The State then reasons that because § 5108 does not arguably protect the Plaintiffs, they do not have standing to assert a tax exemption on that basis. However, the State's argument misapplies the zone of interest test, which is used to determine "whether a *legislatively conferred cause of action* encompasses a particular plaintiff's claim." *Lexmark Intern, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127, 134 S. Ct. 1377, 1387, 188 L. Ed. 2d 392 (2014) (addressing whether plaintiff fell within the class of persons

authorized to sue for false advertising under the Lanham Act) (emphasis added). While the zone of interest test applies to all "statutorily created causes of action[,]" and requires that we presume that such an action "extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked[,]" *see id.* at 129, 134 S. Ct. at 1388, § 5108 is not a statute that creates a cause of action.

[¶10.] Further, the Plaintiffs did not bring suit under § 5108. Rather, they brought this action pursuant to the Declaratory Judgment Act, asserting that the County was without authority to impose ad valorem taxes against their property. "[T]o establish standing in a declaratory judgment action . . . a litigant must show: (1) an injury in fact suffered by the plaintiff, (2) a causal connection between the plaintiff's injury and the conduct of which the plaintiff complains, and (3) the likelihood that the injury will be redressed by a favorable decision." *Abata v. Pennington Cty. Bd. of Comm'rs*, 2019 S.D. 39, ¶ 12, 931 N.W.2d 714, 719. While it is true that "a court cannot be required to speculate as to the presence of a real injury[,]" *see id.* ¶ 11, 931 N.W.2d at 719, there is no need to speculate here.

[¶11.] It was the County's imposition of ad valorem taxation, and not the Secretary of the Interior's authority to acquire land under the IRA, that brought this action into circuit court. Neither party disputes that Plaintiffs have alleged an injury in fact caused by the County's assessment of taxes against the structures pursuant to SDCL 10-4-2.1, thereby satisfying the first two prongs for standing in a declaratory judgment action.[7] It is equally beyond debate that the Plaintiffs have a

---

7. The County's authority to tax, as well as the avenues for relief from unlawful taxation are well established in Title 10. *See* SDCL 10-4-1 (listing the types
(continued . . .)

redressable injury, namely, relief from their tax liability. Therefore, the Plaintiffs have standing to bring this action.

### 2. *Whether the circuit court erred in upholding the disputed taxes.*

[¶12.] The State argues that the County has authority to assess the ad valorem taxes on the Plaintiffs' property in Indian country. Whether the State is permitted to assess the taxes depends on whether federal law preempts the regulatory action. Preemption may be express or implied. It can arise from the explicit language used in a statute. *Mescalero Apache Tribe*, 411 U.S. at 148, 93 S. Ct. at 1270. Or it can occur implicitly. *Law v. City of Sioux Falls*, 2011 S.D. 63, ¶ 10, 804 N.W.2d 428, 432; *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143-44, 100 S. Ct. 2578, 2583-84, 65 L. Ed. 2d 665 (1980). Historically, the United States Supreme Court has used the federal preemption test announced in *Bracker*, which requires assessing tribal interests alongside state and federal interests, to determine whether a state may regulate in Indian country. 448 U.S. 145, 100 S. Ct. 2584. However, at oral argument, both parties agreed that the *Bracker* balancing test does not apply to this case.[8] Moreover, the Tribe has not intervened and the

_____

(. . . continued)

    of property subject to taxation); SDCL 10-4-2 (defining real property for purposes of ad valorem taxation); SDCL 10-18-1 (allowing for abatement and refunds of taxes overpaid); SDCL 10-27-2 (providing tax payers the ability to pay under protest).

8.     In 2019, the Oklahoma Supreme Court held that the Indian Gaming Regulatory Act (IGRA) preempted state ad valorem taxation of gaming equipment assessed against a non-Indian company that leased equipment exclusively to the Cherokee Nation. *Video Game Tech., Inc., v. Rogers Cty. Bd. of Tax Roll Corrections*, 475 P.3d 824 (Okla. 2019). In drawing this

(continued . . .)

record contains no evidence that tribal interests weigh against the County's taxation authority with respect to *non*-Indian lessees, that the County's separate *ad valorem* tax affects the Tribe's ability to lease the land, or that the taxes have impacted tribal interests in other ways. Thus, we apply a standard preemption analysis.

### a. *Express federal preemption under 25 U.S.C. § 5108*

[¶13.]     "Express preemption occurs when there is a specific legislative enactment reflecting the Legislature's intent to preempt any local regulation." *Law*, 2011 S.D. 63, ¶ 10, 804 N.W.2d at 432. The Plaintiffs argue that 25 U.S.C. § 5108 expressly preempts the County from taxing the cabins surrounding Pickerel Lake. The statute (which is contained within the IRA), provides, in relevant part:

> Title to any lands or rights *acquired pursuant to this Act . . .* shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired,

---

(. . . continued)

conclusion, the court applied the *Bracker* balancing test to determine implied preemption even though the Cherokee Nation did not intervene in the action. *Id.* Oklahoma was not the first to apply *Bracker* in this context. In 2013, the Second Circuit also applied the *Bracker* test, but drew the opposite conclusion. *See Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 467 (2d Cir. 2013) (upholding a generally applicable personal property tax assessed against non-Indian venders).

Ultimately, the Oklahoma tax authority petitioned the United States Supreme Court for certiorari review. The Court denied the writ in October 2020 with Justice Thomas dissenting and expressing his view that the "'flexible' [*Bracker*] test has provided little guidance other than that courts should balance federal, tribal, and state interests." *Rogers Cty. Bd. of Tax Roll Corrections v. Video Gaming Tech., Inc.*, 592 U.S. ___, ___ S. Ct. ___ (2020) (Thomas, J., dissenting in denial of certiorari). This seems to confirm that *Bracker* remains authoritative, albeit subject to criticism by one member of the Supreme Court.

and such lands or rights *shall be exempt from State and local taxation.*

(Emphasis added.)

[¶14.]    The Plaintiffs' express preemption argument is conditioned upon the requirement that the Tribe's land was "acquired pursuant" to the IRA. If it was not, the Plaintiffs cannot prevail because 25 U.S.C. § 5108, by its clear and unambiguous terms, is inapplicable in this case. In order to decide the merits then, we first assess whether the property in question was acquired through the IRA. Central to this inquiry is an understanding that subtle differences exist among different individual types of Indian trust land. Indeed, simply stating that land is held in trust by the United States, as the Plaintiffs have done, does not explain how the land *acquired* its trust status.[9]

[¶15.]    The Plaintiffs cannot prevail on their claim that § 5108 expressly preempts the County's ad valorem tax by simply claiming, without more, that the land is *generally* trust land. This is because a number of different trust landholdings exist, a result of the federal government's evolving Indian land policies. The turbulence began in 1887 when Congress attempted to shift tribal lands from communal ownership to western-style individual allotments by passing the General Allotment Act (the Dawes Act). Congress endeavored to open

---

9.    In most instances involving the State's regulatory authority in Indian country, it is unnecessary to consider the precise type of trust land at issue because all trust land is generally regarded as Indian country. *See Oklahoma Tax Comm'n*, 508 U.S. at 125, 113 S. Ct. at 1991 (quoting F. Cohen, *Handbook of Federal Indian Law* 34 (1982 ed.)); *see also* 18 U.S.C. § 1151 (defining Indian country). Under the facts of this case, however, the status of the land is critical to the Plaintiffs' argument because it is based on the applicability of the IRA to establish preemption.

reservations to non-Indian settlements while also assigning individual Indians trust allotments.[10] In 1934, recognizing the Dawes Act was an utter failure, Congress changed directions and passed the Indian Reorganization Act (IRA), which strived to reverse the drastic decrease in Indian landholdings within Indian country. The Eighth Circuit Court of Appeals described the resulting "patchwork" of trust land categories in *Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1001 (8th Cir. 2010).[11] Only one category involves land taken into trust under the IRA.

---

10.    For example, in many instances, land originally allotted to tribal members under the provisions of the Dawes Act has never passed into fee status and continues to be held in trust for the benefit of the original allottees' descendants. This category also includes allotments which were later transferred from individual to tribal control, so long as the trust status was maintained. *Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1001 (8th Cir. 2010). In other cases, land remains in trust today after it was originally designated for Indian schools, or religious missions, or for the federal government's Indian agent for a particular reservation.

11.    The *Podhradsky* court described the following types of trust land:

> *Allotted Trust Lands:* lands allotted to members of the Tribe which have been continuously held in trust for the benefit of the Tribe or its members. This category includes allotments which were later transferred from individual to tribal control, so long as the trust status was maintained.
> . . . .
> *Agency Trust Lands:* lands ceded to the United States in the 1894 Act but reserved for "agency, schools, and other purposes" which then were returned to the Tribe according to the 1929 Act.
> . . . .
> *IRA Trust Lands:* lands acquired by the United States in trust for the benefit of the Tribe pursuant to the IRA.
> . . . .
> *Miscellaneous Trust Lands:* lands acquired by the United States in trust for the benefit of the Tribe other than pursuant to the IRA.

606 F.3d at 1001.

[¶16.] IRA transfers under § 5108, also known as fee-to-trust transfers, serve a particular and distinct purpose. These ad hoc transfers aim to advance the purpose of the IRA by incrementally restoring tribal lands that were previously reduced by the Dawes Act. Undoubtedly to assure that the status change for the former fee lands was complete, Congress included § 5108 to expressly remove newly designated trust lands from state and local taxation. The fee-to-trust process itself is a transparent process. Regulations promulgated by the BIA require notice of the proposed transfer, an opportunity for objections, and administrative adjudication. *See* 25 C.F.R. § 151.11. Those adversely impacted by the administrative decision can seek review in the federal courts. *See* 25 C.F.R. § 151.12.

[¶17.] Despite the unique purpose and method of implementation of § 5108, we are unable to find any support in this record to indicate that the land on which the Plaintiffs' structures sit was ever the subject of a fee-to-trust transfer under the IRA. The circuit court reached the same conclusion. In its memorandum decision, the court observed that "the record does not indicate anything was acquired pursuant to the IRA." The Plaintiffs have failed to refute this statement or support the first inquiry attendant to their express preemption claim with evidence of the most critical element—acquisition pursuant to the IRA.

[¶18.] Ultimately, it is the Plaintiffs who hold the burden of proving this land was acquired under the IRA such that § 5108 is implicated, and they have failed to meet this burden.[12] We do note, however, that multiple entries in the record

---

12. In *DeCoteau*, the United States Supreme Court had occasion to consider the title of land within the former Lake Traverse Indian Reservation. 420 U.S. at

(continued . . .)

suggest that the land may well be allotted trust land, one type of trust land that exists outside the IRA. For instance, the Association's lease with the BIA lists an allotment number (Allotment No. 1199) as the assigned number for the cabin sites. Payments in 2015, 2016, and 2017 were made to the "Bureau of Indian Affairs *for Allottees*." (Emphasis added.)[13]

[¶19.] Without evidence that the land was acquired pursuant to the IRA, the Plaintiffs' additional § 5108 preemption arguments are largely academic. For instance, the Plaintiffs claim that their buildings should be considered part of the trust land because they are so closely connected to the land. However, this question does not present a live controversy if, as we have determined, there is no evidence the land was acquired pursuant to the IRA. Therefore, we need not address

_____

(. . . continued)

> 427–28, 95 S. Ct. at 1084–85. In its opinion, the Supreme Court noted the existence of at least two broad categories of land within the exterior boundaries of the former reservation. The first was allotted land that remained in trust. *Id.* at 445–46, 95 S. Ct. at 1093. The second was land the federal government purchased for re-sale to non-Indian settlers. *Id.* Without additional evidence in the record detailing the status of all parcels within the former boundaries, we can draw no further inference from this record as to what types of trust land may exist, though information from other reported decisions confirms that the Tribe has pursued, to some extent, efforts to transfer land into trust under the IRA. *See generally U.S. Dep't of Interior*, 665 F.3d at 987 (discussing an unsuccessful effort to challenge the acquisition under the IRA of four parcels held in fee lying within the original boundaries of the Lake Traverse Reservation).

> Regardless, the Plaintiffs hold the burden to present facts indicating that the land at issue falls within the IRA, and they have not done so.

13.  Further, the Department of the Interior's schedule of payments to the lessors provides account numbers, trust fraction numbers, and the amounts due under the lease with respect to each individual that owns an interest in the acreage. Some of these interests are owned by individual Indians, while others are owned by the Tribe.

Plaintiffs' principal authority for this position—the Supreme Court's decision in *Mescalero Apache Tribe v. Jones*—or subsequent case law interpreting the IRA.[14]

       *b. Express Preemption under the South Dakota Constitution*

[¶20.]      The Plaintiffs also argue that Article XXII of the South Dakota Constitution preempts the taxes. "The 1889 Enabling Act[,] which admitted South Dakota, North Dakota, Montana, and Washington into the Union[,] contained a provision which required that the constitutions of each of these states provide a disclaimer of title to and jurisdiction over Indian lands within their respective borders." *State v. Onihan*, 427 N.W.2d 365, 367 n.3 (S.D. 1988), *overruled on other grounds by State v. Spotted Horse*, 462 N.W.2d 463 (S.D. 1990).

[¶21.]      Article XXII provides in relevant part:

> *That we*, the people inhabiting the state of South Dakota, *do agree and declare that we forever disclaim all right and title . . .* to all lands *. . . held by any Indian or Indian tribes*; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States; and said *Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States . . . .*

(Emphasis added.)

---

14.    The Supreme Court in *Mescalero* held that 25 U.S.C. § 465 (now 25 U.S.C. § 5108) preempted efforts by New Mexico to assess a use tax upon materials purchased by the Tribe off-reservation and used to make permanent improvements to a tribally-owned ski resort. 411 U.S. at 158, 93 S. Ct. at 1275. The resort was located on land the Tribe leased from the Department of Interior adjoining the Tribe's reservation. *Id.* at 146, 93 S. Ct. at 1269. At the heart of the holding was the Court's determination that the permanent improvements, which included two ski lifts, were so closely connected to the Tribe's leased land that their use was effectively coextensive with the Tribe's leased land on which the resort was located. *Id.* at 158-59, 93 S. Ct. at 1275-76. The situation presented here is much different. The County's ad valorem tax does not implicate the Tribe, its members, or their property.

-13-

[¶22.] Naturally, we look to Article XXII's legal principals to "guide our resolution" on the issue of federal preemption of state court jurisdiction. *See Risse v. Meeks*, 1998 S.D. 112, ¶ 11, 585 N.W.2d 875, 877.[15] However, reliance on Article XXII is unpersuasive because the language of our Constitution contemplates land held by Indians, not permanent structures owned by non-Indians. The County is not expressly preempted from assessing ad valorem taxes on the structures at issue in this case.

### c. *Implied preemption*

[¶23.] "In the absence of express pre-emptive language, Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713, 105 S. Ct. 2371, 2375, 85 L. Ed. 2d 714 (1985) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152, 91 L. Ed. 1447 (1947)); *accord Law*, 2011 S.D. 63, ¶ 10, 804 N.W.2d

---

15. The United States Supreme Court has rejected the claim that similar disclaimer clauses have "controlling significance" on issues of federal preemption. *See Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, P.C.*, 467 U.S. 138, 149, 104 S. Ct. 2267, 2275, 81 L. Ed. 2d 113 (1984) ("[T]he presence or absence of specific jurisdictional disclaimers rarely has had controlling significance in this Court's past decisions about state jurisdiction over Indian affairs or activities on Indian lands." (citing *Arizona v. San Carlos Apache Tribe of Arizona*, 463 U.S. 545, 562, 103 S. Ct. 3201, 3211, 77 L. Ed. 2d 837 (1983))). The Eighth Circuit has likewise declined to accord absolute deference to Article XXII. *See Oglala Sioux Tribe of Pine Ridge Indian Reservation v. State of South Dakota*, 770 F.2d 730, 735 (8th Cir. 1985). In that case, the court held that a "[t]ribe's reliance on the Enabling Act for the proposition that the Pine Ridge Indian Reservation is entirely beyond state jurisdiction [was] misplaced[.]" *Id.*

at 432.  The burden rests on the Plaintiffs to demonstrate preemption.  *Sunflour R.R., Inc. v. Paulson*, 2003 S.D. 122, ¶ 18, 670 N.W.2d 518, 523.

[¶24.]      In assessing implied preemption, we evaluate the "legislative scheme[,]" keeping in mind "the provisions of the entire law," rather than "any particular statute in isolation."  *Law*, 2011 S.D. 63, ¶ 10, 804 N.W.2d at 432.[16]  Of import is "the object sought to be attained by the laws, the nature and power exerted by [Congress], and the character of the obligations imposed by the statutes."  *Id.*

[¶25.]      The question, then, is whether the federal government intended to control, regulate, and manage taxation of improvements owned by non-Indians on trust land such that the State is foreclosed from regulating in this area.  We begin by addressing "the object sought to be attained by the laws[.]"  *Id.*  Here, the Plaintiffs contend the current Department of the Interior regulatory scheme, namely, 25 C.F.R. § 162.017, "clarifies and confirms" that Congress left no room for the County's assessment of taxes here.  More specifically, they rely upon § 162.017(a), which provides that "[s]ubject only to applicable Federal law, permanent improvements on the leased land, without regard to ownership of those improvements, are not subject to any fee, tax, assessment, levy, or other charge imposed by any State or political subdivision of a State."  They also highlight that

---

16.   In *Law*, we examined whether the State wholly occupied the field of video lottery regulation to the exclusion of municipal regulation.  2011 S.D. 63, ¶ 11, 804 N.W.2d at 432-33.  Although *Law* did not concern federal preemption, we explained in *In re Yankton County Commission*, "that state preemption of county ordinances is analogous to federal preemption of state law."  2003 S.D. 109, ¶ 16, 670 N.W.2d 34, 38–39.

the Federal Register declares "the Federal statutes and regulations governing leasing on Indian lands . . . occupy and preempt the field of Indian leasing." Residential, Business, and Wind and Solar Resource Leases on Indian Land, 77 Fed. Reg. 72,440-41 (Dec. 5, 2012).

[¶26.]     The existence of these regulations raises familiar questions regarding the applicability of *Chevron* deference to the interpretation of the BIA regulations. *See Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S. Ct. 2778, 2782, 81 L. Ed. 2d 694 (1984).  Because the Secretary of the Interior is the ultimate supervisor of Indian lands, the Plaintiffs request that we give the Secretary's opinion on this issue full deference under *Chevron* and conclude that Congress's and the BIA's regulation of Indian lands implicitly preempts the taxation.

[¶27.]     In *Chevron*, the United States Supreme Court upheld Environmental Protection Agency (EPA) regulations promulgated as a result of the Clean Air Act. In determining the interpretive power of the regulations, the Court followed a two-step analytical process.  Employing "traditional tools of statutory construction," *see id.* at 843 n.9, 104 S. Ct. at 2782 n.9, the Court first addressed whether a congressional act "directly addressed the precise [legal] question" involved.  *Id.* at 843, 104 S. Ct. at 2781–82.  If Congress has done so, neither the Court nor the agency may circumvent the statutory authority.  If, however, the statute is ambiguous on the specific issue involved, the Court held that it should defer to the agency's interpretation of the statute it administers if the "answer is based on a permissible construction of the statute."  *Id.* at 843, 104 S. Ct. at 2782.

[¶28.] Since the Court handed down the *Chevron* decision, two sitting Justices have questioned the constitutionality of deferring to agency interpretations of federal law in certain situations. In addition, two Justices who have recently joined the Court questioned the same prior to their appointments.[17] Meanwhile, lower courts have struggled with *Chevron's* complicated framework. In the context of preemption and its interplay with agency regulations, the Court has recognized that "an agency regulation *with the force of law* can pre-empt conflicting state requirements." *Wyeth v. Levine*, 555 U.S. 555, 576, 129 S. Ct. 1187, 1200, 173 L. Ed. 2d 51 (2009) (emphasis added). "In such cases," the Court has counseled that courts should "perform[] [their] own conflict determination, relying on the substance of state and federal law and not on agency proclamations of pre-emption." *See id.* at 576, 129 S. Ct. at 1201.

---

17.     *See, e.g.*, *Michigan v. E.P.A.*, 576 U.S. 743, 761–62, 135 S. Ct. 2699, 2712, 192 L. Ed. 2d 674 (2015) (Thomas, J., concurring); *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring); *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 307, 133 S. Ct. 1863, 1874, 185 L. Ed. 2d 941 (2013) (Roberts, C.J., dissenting); Brett Kavanaugh, *Fixing Statutory Interpretation Judging Statutes*, 129 Harv. L. Rev. 2118, 2150 (2016) (declaring *Chevron* a "judicially orchestrated shift of power from Congress to the executive branch"). Scholars join their criticism, sometimes citing principles of separation of powers. *See* Cynthia R. Farina, *Statutory Interpretation and the Balance of Power in the Administrative State*, 89 Colum. L. Rev. 452, 456 (1989). *Chevron* is not immune to criticism among federal circuit court judges either. *See Waterkeeper All. v. Environmental Protection Agency*, 853 F.3d 527, 539 (D.C. Cir. 2017) (Brown, J., concurring) ("An Article III renaissance is emerging against the judicial abdication performed in *Chevron's* name."); *Egan v. Del. River Port Auth.*, 851 F.3d 263, 278 (3d Cir. 2017) (Jordan, J., concurring) ("[T]he Supreme Court has created a doctrine that requires judges to ignore their own best judgment on how to construe a statute, if the executive branch shows up in court with any reasonable interpretation made by the administrator of an agency.").

[¶29.]    Here, however, Congress has not authorized the BIA to preempt the State's authority to tax structures owned by non-Indians. As we have previously stated, neither the Tribe nor individual Indians are involved in this action which concerns taxes levied only against non-Indians who own buildings that are not, themselves, held in trust under the provisions of the IRA. Therefore, the federal regulations relied upon by Plaintiffs do not support a conclusion that allowing states to levy these ad valorem taxes would frustrate the achievement of congressional objectives related to the field of Indian leasing. *See, e.g.*, *id.* at 580-81, 129 S. Ct. at 1203–04 (declining to give the agency decision weight when there is no agency regulation bearing the force of law and state-law claims would not interfere with congressional objectives).

[¶30.]    For these reasons, any preemptive language in the federal regulations has no impact on our analysis. *See e.g.*, 77 Fed. Reg. 72440-01 (stating, without citation to specific congressional authorization, that the regulations "occupy and preempt the field of Indian leasing" and "preclude[] State taxation"). Upon performing our "own conflict determination" without regard to "agency proclamations of pre-emption[,]" we find little evidence of congressional intent to supersede the State's authority. *See Wyeth*, 555 U.S. at 576, 129 S. Ct. at 1201.

[¶31.]    Turning next to "the character of the obligations imposed[,]" *see Law*, 2011 S.D. 63, ¶ 10, 804 N.W.2d at 432, while the federal government retains exclusive power to regulate Indian affairs, *see Pourier v. Bd. of Cty. Comm'rs of Shannon Cty.*, 83 S.D. 235, 157 N.W.2d 532 (1968), the federal government has asserted little to no regulatory power in the area of state-imposed ad valorem taxes

on structures owned by non-Indians.  It is generally within the province of the State to assess property taxes.  *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 478 F. Supp. 1231, 1234 (E.D. Mo. 1979), aff'd, 454 U.S. 100 (1981).  We presume that "Congress does not intend to pre-empt areas of traditional state regulation." *FMC Corp. v. Holliday*, 498 U.S. 52, 62, 111 S. Ct. 403, 410, 112 L. Ed. 2d 356 (1990).  We also assume the State retains its historic power to regulate by imposing state and local taxes.[18]

[¶32.]    Because there is little or no federal regulatory scheme in place with respect to property taxes, and because the State's taxation does not implicate Indians or their tribes, thereby implicating federal law, the State's assessment of nondiscriminatory ad valorem property taxes against structures owned exclusively by non-Indians is not preempted by federal law.  *See, e.g.*, *Mescalero Apache Tribe*, 411 U.S. at 149, 93 S. Ct. at 1270 (upholding non-discriminatory taxes assessed against all state citizens).

[¶33.]    Finally, we note that our preemption holding is strengthened by two time-honored United States Supreme Court decisions and a decision from our own Court.  In the first case, *Fisher*, the Supreme Court upheld a territorial tax of a

---

18.    As the United States Supreme Court recognized long ago, citizens of the State are obligated to pay their taxes for "the taxing power is of vital importance; . . . it is essential to the existence of government[.]" *Providence Bank v. Billings*, 29 U.S. 514, 524, 7 L. Ed. 939 (1830).  "Enjoyment of the privileges of residence within the state, and the attendant right to invoke the protection of its laws, are inseparable from the responsibility for sharing the costs of government." *Lawrence v. State Tax Comm'n of Miss.*, 286 U.S. 276, 279, 52 S. Ct. 556, 557, 76 L. Ed. 1102 (1932).  Here, pursuant to its statutory taxing authority, the County is authorized to assess ad valorem property taxes upon improvements to property within the state.  *See* SDCL 10-4-2(2).  Importantly, the object of the County's taxation is to gain revenue.

section of a non-Indian's railroad that crossed onto reservation land, reasoning the territory's tax did not interfere with the Tribe's sovereignty. *Utah & N. Ry. Co. v. Fisher*, 116 U.S. 28, 29-30, 33, 6 S. Ct. 246, 246-48, 29 L. Ed. 542 (1885).

[¶34.] In the second case, *Thomas*, the Court ruled that Oklahoma could tax cattle owned by non-Indian lessees of Indian land. *Thomas v. Gay*, 169 U.S. 264, 273, 18 S. Ct. 340, 343, 42 L. Ed. 2d 740 (1898). In so holding, the Court commented that those leasing the land, as in this case, received benefits from the County and noted that the taxes were "too remote and indirect to be regarded as an interference with the legislative power of [C]ongress." *Id.* at 275, 18 S. Ct. at 344.[19]

[¶35.] Then, relying on *Thomas*, in 1919, we upheld a state tax imposed on non-Indian personal property located on unceded lands of the Cheyenne River Indian Reservation. *Lebo v. Griffith*, 42 S.D. 198, 173 N.W. 840, 841 (1919). The County used the taxes to maintain a school district serving the reservation. *Id.* In a special concurrence, one member of the Court noted that "the personal property of a white man situate[d] thereon may be taxed, because such taxation does not encroach upon the principle that said Indian lands shall remain under the absolute jurisdiction and control of the Congress." *Id.* (Gates, J., concurring specially).

---

19. Although the United States Supreme Court has not overturned *Fisher* and *Thomas*, federal Indian law has changed significantly since the turn of the Twentieth Century, including the Dawes Act and the subsequent corrective legislation.

    Due to these drastic policy changes regarding Indian land since *Fisher* and *Thomas* were decided, these cases lend support to our conclusion, but do not necessarily control it.

Although more than one hundred years have passed, this holding stands the test of time.

## Conclusion

[¶36.]     The Plaintiffs have satisfied all the prerequisites for standing. Further, the County is neither explicitly nor implicitly preempted by the provisions of § 5108 from assessing ad valorem taxes against the Plaintiffs.  The circuit court did not err by upholding the County's right to impose the tax.  We affirm.

[¶37.]     GILBERTSON, Chief Justice, and JENSEN, SALTER, and DEVANEY, Justices, concur.